McGREGOR and others v. COMSTOCK.

A person claiming title to a vacant lot in the city of New-York, upon which he had paid taxes for some years, inclosed the same with a fence and made a feoffment, with livery of seizin, upon the land; *Held*, a sufficient disseizin to support a fine, though the fence was built, under the advice of counsel, shortly before and with a view to levying the fine.

APPEAL from the Supreme Court. The action was ejectment, brought in 1844 to recover a lot in the city of New-York. Upon the trial, the plaintiffs made title, as the heirs of John McGregor, under a conveyance from the commissioners of forfeiture, of the land in question, as having been

McGregor *v.* Comstock.

forfeited to the people of this state, by the attainder of James De Lancey, to a purchaser who conveyed to their ancestor in 1795. The lot in question was upon the boundary line between farms owned by De Lancey previous to his attainder on the one side and Petrus Stuyvesant on the other. The defendant made title under Stuyvesant and under a fine with proclamations, levied by Egerton Leigh Winthrop in 1827. Winthrop was the devisee of Margaret Stuyvesant, to whom the lot in question was assigned and conveyed upon a partition of the estate of Petrus Stuyvesant among his devisees in 1817. The facts in respect to the character of the possession of Winthrop and those under whom he claimed previous to the levying of the fine are sufficiently stated in the following opinion. The judge charged the jury that the only question was, whether the premises, at the time of making the deeds of feoffment preliminary to the levying the fine, were actually and exclusively inclosed in fence; that if the jury should so find, that fact and the other facts proved by the evidence would establish such a freehold by disseizin, in Winthrop, the defendant's lessor, as would sustain the fine. The plaintiffs excepted to this charge, and requested the judge to charge that if the jury believed the premises had remained vacant until Winthrop was about to begin proceedings to levy the fine, and Winthrop had then inclosed the same in order to levy the fine, Winthrop had not such an estate therein as authorized him to levy the fine. The court declined so to charge, and the plaintiffs excepted. The verdict was for the defendant, and judgment thereon was perfected by the order of the Supreme Court at general term in the first district where the exceptions were heard in the first instance. The plaintiffs appealed to this court.

*Judah Ellsworth,* for the appellants.

*Walter Rutherford,* for the respondent.

ROOSEVELT, J.   The decision of this case turns upon the effect to be given to an ancient proceeding, now no longer in use, denominated a fine, which is set up by the defendant as an absolute bar to the plaintiffs' recovery of the lot in dispute.

James De Lancey, a name well known in the revolutionary history of the state, whose title the plaintiffs claim to hold, was attainted at any early period for adhering to the royal party.   His estates, as a consequence, were disposed of by the commissioners of forfeitures, under the act of the state legislature in 1784.   In 1795, John McGregor, who had then been naturalized only three years, became a purchaser of part of the forfeited estates, including the lot in controversy, then lying vacant, in the outer suburbs of the city. McGregor died in 1802. and the plaintiffs claim as his descendants.

Margaret Stuyvesant. it appears, more than forty years ago, but under what precise title the case does not distinctly disclose, paid the taxes on this property as her own; the same having been set off to her with other lots in the partition of her father's estate among his devisees in 1817.   It would seem, therefore, that the defendant's claim of title, in its origin, dates back at least as far as that period, and that the lot in controversy was then treated by the devisees of Petrus Stuyvesant as part of the Stuyvesant estate.

Seven years after the partition, and after this assertion of ownership and assumption of its burdens, Miss Stuyvesant died and was succeeded by Winthrop as her devisee; who continued in the same practice till a short time before his death in 1832.

Five years, also, before that event, in order, it may be presumed to quiet any doubts arising from the De Lancey attainder, Winthrop, under the advice of his counsel, determined to levy a fine, and thereby to compel all persons who might consider themselves as having any rights under the attainder, to bring forward their claims within five years

McGregor *v.* Comstock.

after public notice, as required by the then existing law; or be "forever barred." The proceedings for that purpose were accordingly instituted in 1827 and completed in 1828, and it is admitted in the case that the several instruments in writing produced on the trial constituted "complete documentary proof of the levying of said fine in due form." And yet, although thus solemnly summoned to assert their rights, and duly apprised of the limitation imposed upon them, the plaintiffs waited not only five, but more than fifteen years, before commencing their suit; leaving the Stuyvesant family, in the meanwhile, to bear the whole burden of the war of taxes and assessments to which the property was subjected — no ordinary struggle in a tax-ridden city like New-York — and then coming in at the close to carry off the fruits of victory.

The attempt certainly does not commend itself to our sympathy. If it be true that eternal vigilance is the price of liberty, a small portion of that commodity ought at least to be required as part of the price of property. Property, it has been well said, has its duties as well as its rights, and he that would enjoy the one should in some degree perform the other.

The plaintiffs rest their claim, notwithstanding the strong admission above quoted and another equally strong, upon a supposed defect in the levying of the fine. They insist that Winthrop inclosed the premises in order to levy the fine, and that the act on that ground did not constitute such a disseizin of the plaintiffs as to authorize the proceeding. The judge who tried the cause, on the contrary, held that the fact of the actual and exclusive inclosure of the premises together with the other facts proved, did establish such a freehold by disseizin in Winthrop as would sustain the fine.

It will thus be seen that the only subject of inquiry presented by the case is, what kind of inclosure did the law require to warrant a fine?

To answer this question, we must first recall to mind the nature of that ancient mode of conveyancing.

A fine, says Lord COKE, is a feoffment (*i. e.*, deed) upon record, called so because *finem imponit litibus*. It puts a *finis* or end to litigation. Its object is to quiet titles more speedily than by the ordinary limitation of twenty and twenty-five years. By means of this final proceeding, one of two contesting claimants of real estate could compel an assertion or abandonment of the pretensions of his adversary in one-fifth the usual period of delay. The practice of levying fines is as ancient in England, from which country we derived it, as any court of record, and dates back beyond the Conquest. It continued in this state as a mode of conveyancing from its earliest settlement by the English till the year 1830, when with other antiquities it was abolished by the legislature, and a simpler system substituted in its stead. (2 *R. S.*, 343.) The repeal, however, having been subsequent to the date of the present fine can have no influence in determining the defendant's rights. As the law stood in 1828, a fine properly levied, after the lapse of five years, was an absolute bar " to conclude as well privies as strangers." (*Laws of* 1813, 358.) Hence it was that the most ample notice to all the world was required. This notice consisted of three parts :

First. An open, notorious taking of possession under claim of title adverse to all others.

Second. Public proclamation in open court at four successive terms.

Third. An advertisement in the state paper and one other journal for five successive weeks; also, a notice on the court house door and a record in the regular office for recording conveyances.

All these prerequisites, except in one particular, it is admitted, were in the present case duly and fully complied with; and even as to that one particular, it is also stated in the case, as another fact admitted, that Winthrop, at the

McGregor *v.* Comstock.

time of levying the fine, had actual and exclusive possession of the premises. The only objection taken at the trial was, that the judge should have charged the jury that if they believed the premises had remained vacant until Winthrop was about to begin proceedings to levy the fine, and that he had then inclosed the same in order to levy the fine, they should find for the plaintiffs.

It is difficult to perceive, if notoriety is the great object, how a fence, put up not only as an inclosure but as a defiance and notice to all the world, can be less within the spirit of the rule than a fence put up as an inclosure merely. The fence was put up by Winthrop, as the case shows, to exclude all others. Violence was not necessary, because no one resisted, and no one was there to resist, the McGregors having, as it would seem, neglected the premises for a third of a century before. It is well settled that, in this country at least, there may be an ouster without force. (*Clapp* v. *Bromagham*, 9 *Cow.*, 530; *Hall* v. *Powell*, 4 *Serg. & Rawle*, 465; *Small* v. *Proctor*, 15 *Mass.*, 498; *Poignard* v. *Smith*, 6 *Pick.*, 172.) In the last case, it was said: "A disseizin may be effected without the actual knowledge of the owner of the land," and that "putting a fence around" is "constructive notice to all the world." In the English case of *Davies* v. *Lowndes*, decided in the Court of Exchequer Chamber (6 *Mann & Gr.*, 502), the twelve judges, on a writ of error, held that the court below was right in charging the jury that, to sustain a fine, all that was necessary was, that the party in possession should have entered upon the estate claiming the dominion of it and exercising the right to it as his own. And what is this but saying in other words that he must have entered, as Dr. Winthrop did, claiming "sole and exclusive possession?" And if a mere entry of one person, with claim of right to exclude all other persons, be sufficient to sustain a fine, how much more must an entry, followed by an actual, physical exclusion, in the form of a high fence surrounding the premises on all sides, and put up expressly as an open,

public assertion of right, and as a defiance to all other claimants?

According to the old doctrine of fines, no man could levy one, as against strangers, unless at the time "he had something" in the premises; *quod partes finis nihil habuerunt* was in such case an effectual plea. (2 *Inst.*, 523.) He must have had, says CRUISE, "an estate of freehold in possession, either by right *or by wrong*, otherwise it might be in the power of any two strangers to deprive a third person of his estate by levying a fine of it." (5 *Cr.*, 135; 4 *Comyn*, 310.) A rightful estate was not necessary. If it had been, the requirement would have involved the absurdity of a legal proceeding to quiet a title already perfect. The object of the law was to furnish a method of quieting titles without inquiring into their origin. Deeds might be lost, or, if not lost, the witnesses to their execution might be dead. Other testimonies, necessary, perhaps, to establish a rightful title, might become buried or obliterated in the lapse of time. Mistakes even might have been made, of either fact or law or both, and costly improvements erected under such mistakes. The party, as in the case of *Lowndes*, above cited, might have claimed the fee, under the idea that he was entitled to it, because there was, as he erroneously supposed, "no heir-at-law, not because he meant to oust him if there was." In such case, as the court said, the question was, and it was "simply a question of fact," not whether he had a good title as devisee, but "whether the devisee entered as being absolutely entitled to the estate as owner." It was the policy of the law, after five years undisturbed adverse possession, with a fine, and, after twenty-five years without, to deny to dormant parties the privilege, and to witnesses, jurors and judges, the annoyance of a legal strife. Fines were looked upon as matters of public concern. It was an established maxim that the interest of the commonwealth, as well as the happiness of individuals, required that a finis, a fine, an end, should be put to lawsuits; *ut sit finis litium,*

*finem imponere litibus.* The quiet of titles and the consequent improvements on real estate were of more importance than the abstract legal right. Lawmakers and judges also saw that if titles, in all cases, without regard to time, were to be traced back to their original source, few, perhaps not even that of the De Lanceys, would escape the charge of "disseizin by wrong."

The statute of fines was a short statute of limitations; but although short it was not arbitrary. Unlike the present law, it was not content with a mere adverse possession. While it abbreviated the slumber it increased the solemnity and frequency of the warning. The case now before us, if the counsel learned in the law were right in their advice, illustrates these requirements. First, a special act of the legislature was procured in 1816. Next, a solemn partition in the following year took place by the commissioners designated in the act, succeeded immediately by a deed duly recorded in a public office, from the commissioners to the aunt of Dr. Winthrop, covering the precise lots now in controversy. Then the aunt, and her nephew after her, from year to year (others did not), paid the taxes and assessments imposed by the state and by the city. Next, the Doctor, as already stated, erected a fence around the entire premises —a high, substantial, board fence. A deed of feoffment, prepared no doubt after the most approved pattern, from Winthrop to Jones, and another back again from Jones to Winthrop, were duly executed. The parties, with a retinue of witnesses, then proceeded in solemn array to the disputed territory, where the deeds were successively read aloud on the land, and livery of seizin made by handing from and to each party, respectively, a twig, clod of earth and stone, "all picked up," as the witness says, "from the lot in question;" it being first ascertained by careful observation, that "no one was within the inclosure."

Having thus established, in due form of law, a seizin in fee, whether by right or by wrong is immaterial, the next

step was to issue an original writ and get up a recognized fictitious suit, in which the one party in due form acknowledging the right of the other, and receiving from the court a license to agree, their "concord" was written down and read aloud and "proclaimed" in the hearing of the judges, and of a wondering, silent audience, from term to term during a whole year, and for five weeks in the public prints of the state. The other particulars it is needless to repeat. Taken together they constitute, it must be admitted, the most ample warning to all persons within the state and not under disability (no one else being bound), that their property, if they were in truth the strictly legal owners, had been openly seized by an adverse claimant, and that unless they reëntered and brought their suit within five years, the courts would not, as they could not, listen to their claim.

These particulars, it is presumed, or some of them, are "the other facts" alluded to by Judge Edwards, in his charge to the jury, as constituting with the actual and exclusive inclosure of the premises "such a freehold by disseizin in Winthrop, the defendant's lessor, as would sustain the fine," and authorize them, as they did, to find for the defendant; and which subsequently, on appeal, induced the general term to affirm his decision.

They are amply sufficient, as it seems to me, to warrant this court in affirming the decision of the Supreme Court.

DENIO, J. The alleged disseizin in this case was evidently a formal act, done with a view to the legal proceeding by which a fine was levied. It was however a case where the party promoting the proceeding had a *bona fide* pretence of right. Egerton L. Winthrop, by whom and for whose benefit it was taken, had a paper title under which he claimed to own the premises, and he and those under whom he claimed had paid the taxes and assessments charged upon the premises for at least ten years before the passing of the fine. The documentary evidence relating to

McGregor *v.* Comstock.

the fine is admitted to be strictly formal and legal, and it was proved that shortly before the papers bear date, Winthrop caused the premises to be inclosed with a substantial board fence. Before the execution of the principal papers Mr. Winthrop and Mr. H. H. Jones, who was the cognizor in the proceeding, went upon the land so inclosed, and the former delivered to the latter a parcel of the earth in the name of livery of seizin. A deed of feoffment from Winthrop to Jones was at the same time executed and delivered. The subsequent proceedings, including the non-claim of the plaintiffs are conceded to be sufficient to vest the title in Winthrop and to bar the plaintiffs, provided the inclosing the premises and the feoffment, with livery to Jones was a sufficient disseizin to vest in the latter what is called an estate of freehold by wrong. Preston, who is considered a very accurate writer upon this subject, says in his *Treatise on Conveyancing* (*p.* 225): " So, if a person enter claiming the freehold, or enters on a vacant possession, claiming the freehold and thus acquires the freehold or enters under a void conveyance purporting to pass the freehold, either by abatement, intrusion or disseizin, in all these cases the fine levied by that person after his entry will be a good foundation for the commencement of the title by non-claim." But he adds, " A mere instantaneous seizin will not suffice," for which latter remark he cites *Townsend* v. *Ash* (3 *Atk.*, 336).

The effect of a fine came before Lord HARDWICKE, in the case cited from *Atkyns*. He assumed that an entry on the land by a wrong doer claiming title would enable him to levy a fine, but he says he must continue in possession, for, he remarks, " a wrong doer to gain a possession by disseizin must not step on the land, and withdraw and leave the rightful owner in possession, which would be sufficient to give a seizin on a feoffment but not to levy a fine." See also *Doe* v. *Spencer* (11 *East*, 495), where the entry of a sheriff's officer under a writ of possession was held sufficient

to enable the party on whose behalf he acted to levy a fine on the same day on which the entry took place, it appearing that the party had afterwards received rent, thus showing that he continued in possession.

That the case before us was not one of an instantaneous entry, where the premises were afterwards left in the possession of parties claiming adversely to Winthrop, or were even left vacant, is obvious from the fact that they were leased for three years by Winthrop to Stivers in 1828, the year following that on which the fine was levied. In 1830, they were leased to the same person for twenty-one years, and it was admitted that Winthrop and those claiming under him had received the rent under these leases from the commencement of the first of them. A mere wrongful entry upon a vacant possession is not a disseizin which will enable the wrong doer to levy a fine. There must be an act equivalent to an actual ouster or expulsion of the first owner. The execution of a common law conveyance with livery of seizin is regarded as such an act. (*Varick* v. *Jackson*, 2 *Wend.*, 166, 203.)

I am of opinion, therfore, that this fine and non-claim has the effect attributed to fines by the statute, to wit, "that it concludeth not only such as be parties and privies thereto and their heirs, but all other people of the world, being of full age, &c., if they make not their entry and bring their action within five years after the fine levied." (1 *R. L.*, 1813, *p.* 358, § 1.) The judge charged the jury that the facts proved, including the fact of inclosure, would establish the validity of the fine and entitle the defendants to a verdict. This was correct, upon the principles which I have mentioned. But he was asked by the plaintiffs' counsel to charge that if the premises had remained vacant until Winthrop was about to begin proceedings to levy the fine, and he had then inclosed the same in order to levy the fine, he had not such an estate as would authorize him to levy it. The judge declined so to charge and the plaintiffs' counsel ex-

.cepted. The request was suggested by the testimony of one of the witnesses, who stated that the inclosure was made by Mr. Winthrop, under the legal direction of Mr. Jay, the counsel under whose advice the fine was levied, who wished Winthrop to inclose the lots to comply with the common law requisition to enable a fine to be levied. I do not think this qualified injuriously the effect of the inclosure and the taking of actual possession. The property had up to that time lain vacant, and Winthrop, claiming to be the owner, wished to do an act which would establish his title and cut off any outstanding claim which might exist. This, we have seen, the law, as it then stood, would allow him to do; but it required the formality of entry upon the vacant possession by a notorious act, and the continuance of such possession. This was done by his construction of the fence and making a feoffment with livery. The acts were none the less valid, from having been done under the advice of counsel.

The judgment should be affirmed.

PRATT, J., dissented; COMSTOCK and SELDEN, Js., expressed no opinion.

Judgment affirmed.