THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
*v.* JENNIE H. LADEW et al., Appellants.

Appeal — orders made in other actions not reviewable on
appeal from judgment — real property — tax sale — notice of
redemption — L. 1885, ch. 448, unavailing as curative act to
perfect title in state to lands bid in at void sale for taxes —
act not a statute of limitations — advertisement as " wild,
vacant and forest lands " of property actually in adverse
occupancy unauthorized and insufficient to compel occupant
to act — grant to state of land held adversely not forbidden —
grant by one who himself received grant while land was held
adversely void — L. 1910, ch. 628, to be construed prospectively
— title by adverse possession — erroneous exclusion of evidence.

1. Orders made in other actions modifying judgments of dismissal
therein by striking out the words " on the merits " may not be
reviewed on an appeal from the judgment herein.

2. Notice of redemption from a tax sale, after the adoption of
chapter 427 of the Laws of 1855, was regulated by section 68 of that
act. Section 83 of part 1 of chapter 13 of title 3 of the Revised
Statutes was thereafter no longer applicable.

3. Chapter 448 of the Laws of 1885, considered as a curative act,
was unavailing to perfect title in the state to lands bid in by it at a
sale for taxes held under chapter 427 of the Laws of 1855, where such
sale was void because of jurisdictional defects in the levying and
assessment of the taxes for which the sale was had. Nor might the
act be treated as a statute of limitations, for the state might not be
sued without its consent and this was not given. Such consent was
thereafter given by chapter 711 of the Laws of 1893, but an advertise-
ment by the comptroller under authority of this act of the lands in
question as " wild, vacant and forest lands " was unauthorized where
as in this case the lands were at the time in actual adverse occupancy.
Nor did such advertisement set in operation any statute of limitations.
The adverse occupant may not without ouster, by the mere insertion
of an advertisement, be compelled to act.

4. A grant to the state of land held adversely is not forbidden by
section 225 of the Real Property Law. A grant to the state, however,
of land so occupied by one who himself received his grant while the
land was also so held, passes no title, legal or equitable. The state
may not acquire what its grantor never had. Consequently chapter
628 of the Laws of 1910, amending the Real Property Law and pro-

viding that such a series of transfers would vest title in the people, effects more than a mere rule of procedure. It alters the substance of the law and is to be construed prospectively.

5. Upon examination of the evidence, *held*, that the defendant has acquired title by adverse possession.

6. As, however, evidence showing conclusively the invalidity of the tax deeds on which the state relies was erroneously excluded a new trial must be granted.

· *People* v. *Ladew*, 204 App. Div. 903, reversed.

(Argued December 4, 1923; decided February 19, 1924.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered February 3, 1923, affirming a judgment in favor of plaintiff entered upon a decision of the court at a Trial Term without a jury.

*George A. Larkin* for appellants. It was error for the trial court to strike the words " on the merits " from the former judgments. (*People* v. *Santa Clara Lumber Co.*, 213 N. Y. 61; Code Civ. Pro. § 1209; *United States* v. *Parker*, 120 N. Y. 89; 3 Black. Comm. 296; *Thomasson* v. *Odum*, 31 Ala. 108; *Kellogg* v. *Gilbert*, 10 Johns. 226; *Cameron* v. *Chicago R. R. Co.*, 51 Minn. 153; *Stoutenborough* v. *Board of Education*, 104 Cal. 664; *Pelton* v. *Mont*, 11 Vt. 148; *Hoover* v. *Mitchell*, 23 Gratt. 387; *Hope* v. *Acker*, 7 Abb. .Pr. 308; *Mason* v. *Kansas City Belt Line*, 226 Mo. 212; *Shoop Family Medicine Co.* v. *Showalter*, 120 Wis. 663; *Krowse* v. *McVickar*, 207 N. Y. 213.) The court was in error in determining as a fact that Durant applied for and accepted an appointment as custodian of the state; that thereafter he entered into possession of the lands in question as such custodian; that his title was in recognition of the state's title; and that that of his successors in title, the Ladews, was in like recognition. (1 Mechem on Agency, § 613; *Williamson* v. *Richardson*, Fed. Cas. 17,754; *Converse* v. *Dillaye*, 62 N. Y. 621; *Howland* v. *Newark Cemetery Assn.*, 66

Barb. 366; *Fosgate* v. *Herkimer Hydraulic Mfg. Co.,* 12 Barb. 352; *Matter of Dept. of Parks,* 73 N. Y. 560; *Briggs* v. *Prosser,* 14 Wend. 227; *Jackson ex dem. Brown* v. *Ayers,* 14 Johns. 220; *Doolittle* v. *Eddy,* 7 Barb. 74; Warvell on Vendors, § 186.) Adverse possession is not broken by an offer by the person in possession to purchase an outstanding claim of title or negotiating with claimants, although such claimants have at the time the legal title to the land, if there is no waiver or non-claim on the part of the occupant. (*Small* v. *Proctor,* 15 Mass. 495; *Warren* v. *Bowdran,* 156 Mass. 280; *Chapin* v. *Hunt,* 40 Mich. 595; *Walbrunn* v. *Ballen,* 68 Mo. 164; *Webb* v. *Thiele,* 56 Neb. 752; *McAllister* v. *Hartzell,* 60 Ohio, 69; *Bannon* v. *Brandon,* 34 Penn. St. 263; *Cuellar* v. *De Witt,* 5 Tex. Civ. App. 568; *Tolbey* v. *Secor,* 60 Wis. 310; *Clithero* v. *Fenner,* 122 Wis. 356.) The court's conclusion of law that Dunning was never an occupant within the meaning of the Tax Law, is not warranted by the evidence and the court's finding of fact. (*People* v. *Gaus,* 134 App. Div. 80; 198 N. Y. 501; *Clark* v. *Kirkland,* 133 App. Div. 826; *Rourke* v. *Metz,* 139 App. Div. 155; 202 N. Y. 604; *People ex rel. Chase* v. *Wemple,* 144 N. Y. 478; *Cary* v. *Given,* 144 App. Div. 221; *People ex rel. Russell* v. *Doty,* 234 N. Y. 559; *People* v. *Ladew,* 189 N. Y. 355.) The comptroller's tax deed of February 1, 1875, was a nullity, void and ineffectual to pass title to the state. (*People* v. *Inman,* 197 N. Y. 200.) The record of the deed was void because no notice to redeem was given to Dunning, who, under the finding of the court, was an occupant in 1875, when the comptroller's deed was given. (L. 1855, ch. 427, § 68; *Hand* v. *Ballou,* 12 N. Y. 541; *Harrison* v. *Caswell,* 17 App. Div. 252; *Stewart* v. *Crysler,* 100 N. Y. 378; *Lockwood* v. *Gehlart,* 127 N. Y. 241, 250; *Lucas* v. *McEnerna,* 19 Hun, 14; *People* v. *Platzoeder,* 118 Misc. Rep. 11; *Farmers Bank* v. *Hale,* 59 N. Y. 53; *Matter of Rourke* v. *Metz,* 139 App. Div. 155; 202 N. Y. 604; *People ex rel. Moynehan* v. *Gaus,* 134 App. Div. 80;

198 N. Y. 508; *Clark* v. *Kirkland*, 133 App. Div. 826; *Comstock* v. *Beardsley*, 15 Wend. 348.) The champertous deeds of 1896, 1897 and 1899 to Webb, and from Webb to the state, were not validated by the amendments of 1909 and 1910 of the Real Property Law, because those amendments are not retroactive. (*Cox* v. *Mayor*, 103 N. Y. 519; *Cromwell* v. *MacLean*, 123 N. Y. 474; *Jacobus* v. *Colgate*, 217 N. Y. 235; *Smith* v. *Long*, 12 Abb. [N. C.] 113; *Knickerbocker Ins. Co.* v. *Nelson*, 78 N. Y. 137; *Smith* v. *Rathbun*, 75 N. Y. 125; *Archibald* v. *N. Y. C., etc., Co.*, 1 App. Div. 251; *Jackson* v. *Esty*, 7 Wend. 148; *Bush* v. *Davison*, 16 Wend. 550; *Hand* v. *Ballou*, 12 N. Y. 541; *People* v. *Wemple*, 144 N. Y. 478; *Clark* v. *Kirkland*, 133 App. Div. 826; *People* v. *Gaus*, 134 App. Div. 80; 198 N. Y. 501; *People* v. *Williams*, 145 App. Div. 34; *Nichols* v. *Kellas*, 90 Misc. Rep. 432.)

*Carl Sherman, Attorney-General* (*Irving I. Goldsmith* of counsel), for respondent. The judgment in the action of *People* v. *Ladew*, entered in the office of the clerk of Hamilton county on the 17th day of February, 1912, in so far as it assumed to dismiss the complaint upon the merits, was wholly unauthorized and void, and the same is not a bar to the bringing and maintenance of the present action. (*Bush* v. *O'Brien*, 164 N. Y. 205.) Unless, in September, 1873, Osprey Island was in the actual occupancy of Dunning within the meaning of section 68 of the act of 1855, the notice to redeem prescribed by said section was not required to be served and the state's tax deed was properly recorded without proof of service of said notice. Said deed being presumptively valid, the burden rested upon appellants to show such occupancy. (*Bank of Utica* v. *Mersereau*, 3 Barb. Ch. 528; *Hand* v. *Ballou*, 12 N. Y. 541.) Neither in October, 1873 (end of redemption period), nor in February, 1875 (when deed was given), was Dunning an occupant of Osprey Island within the meaning of the

act of 1855; and notice to redeem was not required to be served on him as a condition precedent to recording the state's tax deed of township 40, dated February 1, 1875. (*Dash* v. *Van Kleeck*, 7 Johns. 498; *Farmers Bank* v. *Hale*, 59 N. Y. 53; *People ex rel. McDonald* v. *Keeler*, 99 N. Y. 463; *Bush* v. *Davison*, 16 Wend. 550; *Nichols* v. *Kellas*, 90 Misc. Rep. 432; 173 App. Div. 923; *People* v. *Baker*, 180 App. Div. 275; 183 App. Div. 909; *Ostrander* v. *Reiss*, 206 N. Y. 448; *Kerrains* v. *People*, 60 N. Y. 221; *Comstock* v. *Beardsley*, 15 Wend. 348; *People ex rel. Marsh* v. *Campbell*, 143 N. Y. 335; *Bush* v. *Davison*, 16 Wend. 550; *Nickell* v. *Tracy*, 184 N. Y. 386.) The 1875 tax deed is conclusive evidence of title. (*Wallace* v. *McEchron*, 176 N. Y. 424; *Ostrander* v. *Reis*, 206 N. Y. 448; *Saranac L. & T. Co.* v. *Roberts*, 195 N. Y. 303.) The claim that the state's title, derived from the original patent, is void, as being in contravention of the statute against the sale of pretended titles, is without merit and constitutes no defense to the action. (*Smith* v. *Long*, 12 Abb. [N. C.] 113; *Sedgwick* v. *Stanton*, 14 N. Y. 289; *Fowler* v. *Cullan*, 102 N. Y. 395; *Irwin* v. *Curie*, 171 N. Y. 409; *W. W. Mfg. Co.* v. *Shanahan*, 128 N. Y. 345; *People* v. *Budd*, 117 N. Y. 13; *Hamilton* v. *Wright*, 37 N. Y. 502; *McFaddin* v. *E. S. Buel Co.*, 185 U. S. 505; *Watson* v. *Mercer*, 8 Pet. 100; *Tifft* v. *City of Buffalo*, 82 N. Y. 204.) Appellants failed to establish title by adverse possession. (*Little* v. *Libby*, 2 Me. 242; *Ring* v. *Shoneberger*, 2 Watts [Penn.], 23; *Jackson* v. *Jay*, 9 Johns. 102; *People* v. *Baldwin*, 113 Misc. Rep. 172; 197 App. Div. 285; *Lawrence* v. *Hudson*, 60 N. Y. 102.)

*Benjamin McClung* and *Graham Sumner* for defendants in other actions, *amici curiæ*. The state has not acquired any title under the tax deed of February 1, 1875. (*People* v. *Inman*, 197 N. Y. 200; *Wallace* v. *McEchron*, 176 N. Y. 424; *Ostrander* v. *Bell*, 199 App. Div. 304; 234

27

**418**                    PEOPLE *v.* LADEW.

N. Y. 566.) The failure of the parties having the legal title or the actual possession of the land to bring an action against the comptroller to cancel the tax deed of February 1, 1875, or dispossess him from the land, did not operate to transfer the title to the state. (*People* v. *Ladew*, 189 N. Y. 360; *People* v. *Inman*, 197 N. Y. 200; *Wallace* v. *McEchron*, 176 N. Y. 424; *Ostrander* v. *Reis*, 206 N. Y. 448; *Ostrander* v. *Bell*, 109 App. Div. 304; 234 N. Y. 566; *Nind* v. *Meyers*, 8 L. R. A. [N. S.] 157, note; *People* v. *Turner*, 145 N. Y. 451; *S. L. Timber Co.* v. *Roberts*, 195 N. Y. 303; *Meigs* v. *Roberts*, 162 N. Y. 371.) The state has not acquired any title under the Webb deeds of 1897 and 1899 or the Bell and Golding deeds of 1909 with respect to lands in the actual possession of parties claiming under adverse titles. (*Pearce* v. *Moore*, 114 N. Y. 256; *Dever* v. *Hagerty*, 169 N. Y. 481; *Sheridan* v. *Cardwell*, 145 App. Div. 609; *Smith* v. *Long*, 12 Abb. [N. C.] 113; *Jacobus* v. *Colgate*, 217 N. Y. 236.)

ANDREWS, J. This litigation is already venerable. It relates to the title of Big and Little Osprey Islands in Raquette Lake. In October, 1901, an action in ejectment was brought by the People against Ladew to recover possession of the larger island. The plaintiff succeeded at Trial Term and in the Appellate Division. It rested its title on three tax deeds dated respectively in 1875, 1881 and 1884. The defendant proved title to the land as against the original owner by adverse possession. (*People* v. *Ladew*, 189 N. Y. 355, 358.) We held that as the predecessors of Ladew were in occupation of the island when the deeds were given and as no notice to redeem required by statute had been served upon them, the deeds were void and we granted a new trial. A second action of the same character was begun in 1909 with regard to Little Osprey. With these two actions pending the conservation commission in 1912 authorized the attorney-general to discontinue them. Thereafter

he and the defendants' attorney stipulated that an order might be entered discontinuing such actions and for the entry of a judgment in each dismissing the complaints on the merits without costs. Such order was then entered on the application of the attorney-general on condition, however, that it should be effective only when approved by the governor. This approval was had and then, again on motion of the attorney-general, a judgment was entered dismissing each complaint on the merits, without costs. In July, 1914, the present action was brought involving the title to both islands, the People seeking the same relief as in the two former actions. In it among other defenses the defendant pleaded in bar the two judgments to which reference has been made. At the opening of the trial the plaintiff moved in the original actions to strike from the judgments the words " on the merits." The motion was granted and the case proceeded to trial.

Clearly the original judgments were unauthorized. The conservation commission had consented merely to a discontinuance of the actions, not to a judgment that would be conclusive. Nor had the court gone further. (Laws of 1911, chap. 647, sec. 9.) The People were entitled to relief. Whether the order as made would have been modified had an appeal been taken — whether the defendant might not have claimed that the judgments entered on a conditional stipulation should be vacated entirely leaving the two actions pending when the condition failed — these questions are not before us. The order was made. It was never properly questioned. It was in other actions, not in the present. No appeal from this judgment can bring it up for review. Being then simply judgments for dismissal, these judgments are not a bar to the present action. (Code Civ. Pro. sec. 1209.)

On this trial the state relied on two sources of title. In 1786 a patent for these and other lands was given to Robert G. Livingston. Through various mesne con-

veyances the state by deeds given in 1897, 1899 and 1904 is said to have re-acquired record title to them.   The defendant asserts not only that he had then gained title to the islands by adverse possession but that as he during the years in question had actual adverse occupancy the deeds were void for champerty.   The state also claims under a tax sale in 1871 and a deed to it in pursuance of that sale in 1875.   It says that under the facts as they now stand there was no one in occupancy of the land in 1873 and, therefore, the ruling formerly made by us is no longer applicable.   It further says that whether the deeds were or were not valid any possible defect was cured by a notice given pursuant to section 13, chapter 711, Laws of 1893.

1. As to the title of the state under the tax deed.   In 1871 a large tract of land, including the islands in question, was sold for unpaid taxes for the years 1861 to 1865.   These proceedings were under the authority of chapter 427 of the Laws of 1855 having to do with the lands of non-residents.   The land was bid in by the state.   (Sec. 66.)   Within two years of the sale the owner or occupant might redeem.   (Sec. 50.)   If no redemption is had the comptroller shall at the end of the period execute a tax deed of the land sold which shall vest in the grantee an absolute estate in fee simple (Sec. 63) and shall be presumptive evidence that the sale and all proceedings prior thereto, from and including the assessment of the land, and all notices required by law to be given, prior to the expiration of the two years allowed to redeem were regular.   (Sec. 65.)   However, if at the end of the two years allowed for redemption the land is in the actual occupancy of any one, notice to redeem must be given to such person within the additional term of two years, and no tax deed may be recorded unless such notice is given.   (Sec. 68.)   No title passes if such notice is not given.   (Sec. 72; *Bush* v. *Davison*, 16 Wend. 550; *Ostrander* v. *Reis*, 206 N. Y.

448.) The deed before us was given in 1875 and recorded in 1877.

In the former case of *People* v. *Ladew* it was found that one Dunning had actually occupied Osprey Island under a claim of title from 1869 to 1881 and that no notice was ever served upon him. We, therefore, held that the deed was void. The present record is not the same. It is now found that one Murray first occupied the island in 1868. Upon it he built an inclosed camp where he entertained large numbers of tourists, using it for a part of each summer and fall until 1874. Dunning was Murray's guide. He also occupied the camp parts of each year during Murray's absence. Apparently he remained there winters making it his chief camp while trapping. He raised vegetables and there kept his outfit for hunting and trapping but did not claim to own or have exclusive possession of the islands. Under such findings were Murray or Dunning or both actual occupants of Osprey Island in 1873, two years after the sale?

" Actual occupancy " implies more than casual or temporary presence on the land. It need not be such a possession as would constitute adverse possession, but there must be some elements of permanency. In *Jackson* v. *Esty* (7 Wend. 148) Carpenter had actual possession and occupancy and held such possession and the betterments under a conveyance although he did not claim title to the land. In *Comstock* v. *Beardsley* (15 Wend. 349) the words, Judge NELSON said, were used in the same sense as the word " occupant " was used in chapter 262 of the Laws of 1823, relating to the assessment of taxes. Under that act clearly neither Dunning nor Murray would have been taxable. In *Bush* v. *Davison* (16 Wend. 550) Phillips was in possession of a dwelling house as a tenant at sufferance. In *People ex rel. Russell* v. *Doty* (234 N. Y. 559) a vacant lot was cultivated each year by a tenant, and such use of the land was open and notorious. More nearly in point is *People ex rel.*

*Marsh* v. *Campbell* (143 N. Y. 335). There the same Dunning who is involved in this litigation had built a log house on an island in one of the lakes of the Fulton Chain. It was used by him, the evidence shows, in his business as a guide. In it he kept household furniture, boats and sporting implements. And in it he also entertained parties who hired him. As here he made no claim to own the land. We held he was not an actual occupant within the meaning of the statute. This result would not have been altered if it had also appeared " that he raised vegetables."

The Revised Statutes had originally provided that notice to redeem must be given to one in actual occupancy " at the time of the conveyance." (R. S. part 1, chap. 13, tit. 3, sec. 83.) In 1830 notice was required as now to an occupant at the expiration of the time to redeem. (Laws of 1830, chap. 108.) It was held that these two acts were not inconsistent; that both notices were required. (*Hand* v. *Ballou,* 12 N. Y. 541.) As the act of 1855 did not specifically repeal this section of the Revised Statutes it is said we should now hold that the two provisions are still consistent and that both still stand. The act of 1855, however, is intended as a complete codification of the law. The provision that a deed given, if there is no occupant at the end of two years from the sale and no redemption, shall vest an absolute title in the grantee (Sec. 63) is repugnant to the idea that any further notice is required. The holding of the trial judge, therefore, that occupation in 1875 was immaterial is right. No notice to redeem was required.

The appellant, however, offered in evidence certain facts which if admitted would have shown that the taxes for the years in question never became a lien on the land. The board of assessors of Hamilton county for these years did not ascertain or extend, nor did they by resolution levy the tax upon the assessment roll of the various towns. They did not ascertain or extend the tax to be

levied against the taxable inhabitants of the various towns. They did not levy the tax for the county, including the state tax, upon the valuations as equalized by them. Finally they did not attempt to set down in a separate column in the assessment roll of each tax district the sum to be paid as a tax on the real estate including the tax sales as fixed by the comptroller. The tax roll for 1862 also contained no oath of the assessors. As to these facts there was no dispute. Because of other litigation the court and the counsel was familiar with them. The evidence was excluded as immaterial. For present purposes we shall treat it as in the record.

So treating it, the title of the owners was not divested by the sale or the subsequent deed. The tax itself and the sale were absolutely void. (*People* v. *Inman,* 197 N. Y. 200.) Any presumption of regularity that may have existed is rebutted. All this the state concedes.

In 1874, and before the tax deed was given, Dunning went into permanent possession of the island. He then made an oral claim of ownership and excluded other people therefrom. He built an ice house, cultivated a few rods of land and lived there until 1879, calling it and making it his home and asserted ownership, " basing his claim upon nothing else than that he had gone into possession when no other person was there." Even if, as has been held, this did not constitute adverse possession as against the true owners, there is no room for finding that during these years possession, actual or constructive, was in the state. In 1879 one Durant applied to the commissioners of the land office to purchase Osprey Islands. The application was denied but Mr. Durant was appointed custodian of the islands to protect the scenery and prevent trespasses. The appointment was at pleasure and without compensation. But Dunning was still in possession and the respondent expressly admits that he remained in possession until he deeded it to Durant in 1881. On several occasions Durant and

his workmen were driven from the island at the point of a gun. Such are the findings. This conveyance was made on December 22, 1881. Meanwhile, however, on November 22, 1881, one John H. Bergen had been appointed custodian of Osprey Island, to prevent trespasses and to protect the interests of the state. Durant's appointment having been at will, this action must be a revocation of his prior appointment. (*Matter of Hennen*, 13 Pet. 230.) Other facts tend to show that neither the state nor Durant supposed that Durant held the land as custodian. The plaintiff introduced in evidence the report of the forest commission for 1887 which listed the " occupants " of land in the vicinity and among them Durant. The state taxed Durant for the land. When Durant in 1882 made to the state an offer to purchase the islands at $2 per acre he spoke of the islands " to which I have title from parties who occupied the same for many years." The attempt on his part to purchase a possible outstanding title is no admission that the true title was in the state. (*Monnot* v. *Murphy*, 207 N. Y. 240.)

Any implied finding, therefore, that Durant was in possession of the islands as custodian or any express finding to that effect is opposed by the uncontradicted evidence. Being no longer custodian, any possession he may have acquired after November, 1881, was not possession by the state. And his possession such as it was continued until he conveyed to Ladew in 1891.

In 1885 two acts were passed affecting the Tax Law. With chapter 453 we have no present concern. Chapter 448 provided that any conveyances that had heretofore been executed by the comptroller, after they had been recorded for two years shall, six months after the act took effect, be conclusive evidence that the sale and all proceedings prior thereto were regular. This provision was not applicable, however, to any action, proceeding or application begun within six months.

As to this statute, standing by itself it is enough to

say without considering other possible objections that it could not take effect as a curative act for by such means the title might not be transferred from the true owners to the state. It might not operate as a statute of limitations for the state might not be sued without its own consent and this consent was not given. (*People* v. *Inman*, 197 N. Y. 200.)

Such then was the situation in 1891. The state had no title to the land. It had no possession actual or constructive. The title was vested in the successors of the original patentee from the state. Durant was in occupation. Whether he held adversely or not we need not consider. In any event during that year he conveyed the premises to Joseph H. Ladew who later conveyed them to his wife, Jennie. Ladew thereupon entered upon the islands " and has since continuously occupied the same, claiming title thereto and using said premises, spending large sums of money thereon for improvements, and he and his grantee, the defendant Jennie H. Ladew, his wife, have since said deed from Charles W. Durant occupied and used said premises to the exclusion of all others to the present time." The larger island contains seventeen acres of land; the smaller one acre. The uncontradicted evidence is that Ladew paid all taxes, received rent, cleared a portion of the island for a farm and garden, kept cows for a time and fenced in a pasture for them, made paths through the woods, built a summer house on the smaller and new buildings scattered over the larger. This was adverse as against the true owners within the meaning of sections 369 and 370 of the Code. (*Trustees of East Hampton* v. *Kirk*, 84 N. Y. 215; *Monnot* v. *Murphy*, 207 N. Y. 240; *Koch* v. *Ellwood*, 138 App. Div. 584.)

In 1893 again two acts were passed to which we must refer. Chapter 413 was merely a curative act and did not make legal the sale of 1871. Chapter 711 repealed the pertinent sections of chapter 453 of the Laws of 1885

to which reference has been made and provided (Sec. 13) that the comptroller might advertise for three weeks a list of " the wild, vacant and forest lands to which the state holds title, from a tax sale or otherwise," and thereafter " all such wild, vacant or forest lands are hereby declared to be and shall be deemed to be in the actual possession of the comptroller, and such possession shall be deemed to continue until he has been dispossessed by the judgment of a court of competent jurisdiction." This act was intended to furnish a remedy to the landowner against the state. (*Saranac Land & Timber Co.* v. *Roberts*, 195 N. Y. 303.) It was a consent by the state that it might be sued. Therefore, the provisions of chapter 448 of the Laws of 1885, before ineffective as a statute of limitations because the state might not be sued, now should be enforced. Acting under this statute the comptroller in 1894 did advertise a list of some twenty-four typewritten pages of " wild, vacant and forest lands," covering some hundreds of thousands of acres, including all " township 40 " with some exceptions not including these islands. The state claims that the short Statute of Limitations ran from the completion of this advertisement. The owner had until July 1, 1896, in which to assert his rights. If he failed to do so the tax title of the state became unassailable.

This argument may not prevail for several reasons. The authority given included only " wild, vacant and forest lands." Under the findings these lands might not be said to be vacant in 1894. At the time Ladew certainly was in actual occupation of the islands, and other provisions of the statute show that what the legislature had in mind was the distinction between occupied and vacant land. This construction and this construction only would make the statute effective. Constructive possession is attributed to the holder of the paper title in the absence of any adverse holding. That rule may be changed. Where a tax deed was given to

the state under an illegal tax sale there were four
possibilities.   The owner or some one else under him may
retain physical possession of the property.   The land
may be in possession of one claiming adversely to the
owner.   The state may acquire physical possession.   The
land may be vacant, in which case constructive possession,
formerly attributed to the owner, may now be attributed
to the state.   In either of these last two cases the owner
is wronged and he may sue in ejectment as in *Saranac
Land & Timber Co.* v. *Roberts* (195 N. Y. 303) and the
statute may fix a short period of limitation.   This is far
from the proposition that one actually in possession of
the land, not disturbed in any way, with no act of ouster
by the state, by the mere insertion of an advertisement
that he may never see, loses in law the possession which
in fact he still has — that to avoid subsequent ejection
he may be compelled to defend his possession as to which
there has been no interference.   (*Meigs* v. *Roberts,* 162
N. Y. 371; *Joslyn* v. *Rockwell,* 128 N. Y. 334.)   Is he to
sue to recover possession of land?   It is still his.   In
trespass?   There has been none.   Indeed he has suffered
no wrong unless it be that a cloud has been placed upon
his title.   It may be that in an action to remove such
a cloud the state might plead the statute.   Surely, how-
ever, its effect can go no further.   So if the land is held
adversely.   Neither the state nor the owner has possession
actual or constructive.   For one reason or another the
owner may not desire immediately to sue the wrongdoer.
As for the state it has not injured him.   It has not taken
possession nor committed trespass.   It may be that at
his election he may treat the state as in possession under
some theory of legal fiction.   Must he do so?   If he
sues the state alone what effective judgment may he
obtain?   As against it is he entitled to damages for
withholding the land?   May he make both the state
and the adverse possessor defendants and try out their
independent and conflicting titles in the same action

when the theory of the statute is that the state is the occupant? Section 1502 of the Code has no such meaning. It must be construed in connection with section 484 and section 1516. (*Jackson* v. *Andrews,* 7 Wend. 152; *Hubbell* v. *Lerch,* 58 N. Y. 237; *Voorhies* v. *Voorhies,* 24 Barb. 150.) Next the lands to be advertised are lands to which the state "holds title." These words should not be construed too strictly. If the lands were in fact vacant and the state had a good title thereto, it already was in constructive possession. "Holds title" must mean less than this. But for the reasons given, it cannot mean a naked claim of title, void, with no pretense of possession to land occupied by another. It means something between these two extremes — it means a claim of title to vacant lands or to lands in its possession.

It follows that no tax title to the property in question was ever acquired by the state.

2. As to the paper title of the state. In 1786 the state granted township 40 of Totten & Crossfield's Purchase in Hamilton county containing 25,200 acres to Robert G. Livingston. In 1852 the title to the greater part of this township, including the islands in question, was vested in Abner Benedict. His grantor had conveyed some lands in the township, not including, however, the land in dispute, to Joel Benedict and he himself conveyed to Mark H. Beecher a quarter of some seven thousand acres, also not touching the two islands. In that year Abner Benedict conveyed to Mead, Sackett, Hay and Platt 8,000 acres as yet undivided and also four-fifths of his interest in the balance of the township after deducting 18,350 acres. Apparently the original survey underestimated the amount of land contained in said township. Apparently also the 8,000 acres lay outside of the islands and they were not included in the 18,350 acres. In 1866 the interest of these grantees was vested three-fourths in Mead and one-fourth in Platt. Platt's interest was incumbered by a mortgage given to one

Raymond and one-third of Mead's interest by a mortgage given by him to Platt in 1857 and at this time held by Rebecca Bush. In that year the comptroller sold the whole township for taxes and in 1869 conveyed to Mead by a tax deed 15,484 acres " what remains of township 40," with some exceptions not material here. This deed seems to have covered the islands. Mead in making this purchase was acting for others as well as for himself and he executed an agreement with Abner Benedict, L. C. Platt, Joel Benedict and Mark H. Beecher to convey to each the interests owned by them before the sale. The interests of Joel Benedict and Beecher as we have seen did not cover the islands and may be ignored. There remained Abner Benedict, Platt and Mead. In 1869 Mead reconveyed to Benedict his proper interest. No reconveyance to Platt appears. Probably some arrangement was made. In any event the Raymond mortgage was assigned to a Mrs. Marsh in 1899 and in the same year Platt deeded to her all his interest in lot 40. During the same year she acquired all the Mead interest. The title to the islands was now vested in Benedict and Mrs. Marsh. Mrs. Marsh conveyed her interest in 1899 to W. Seward Webb who had already acquired in 1896 under a deed from the purchaser on foreclosure of the mortgage given by Mead to Platt title to one-third of Platt's share. Webb in 1897 had conveyed to the People certain lands in the township which probably did not cover the property in question; but in 1899 he gave a deed to the People covering all his interests in the township. They, therefore, then held paper title to the islands except for such interests as were retained by Benedict. In 1904 the Benedict interest was conveyed to John M. Golding who in turn conveyed a sixth of his interest to William Benedict. A subsequent conveyance was made by the Benedicts to one Bell who could have acquired no part of the islands by his deed except the sixth interest of William. However this may

be, the state by a partition deed set off to Bell and Golding certain lands on lot 40 not including the islands and they conveyed to it the balance. So from this time on a complete paper title to the land in question and to all of it was vested in the state. But both the conveyances to it and the conveyances to its grantors were made after 1891, from which year at least the premises were occupied adversely to the true owners.

A grant of real property is absolutely void if at the time of the delivery thereof such property is in actual possession of a person claiming under a title adverse to that of the grantor. (Real Property Law of 1896, sec. 225.) And this was true also at common law. Ladew's possession was adverse possession under this rule. (*Arents* v. *L. I. R. R. Co.*, 156 N. Y. 1; *Green* v. *Horn*, 207 N. Y. 489.) But the statute does not forbid grants directly to the state. Our laws as to champerty and maintenance come to us from the far past. The statute 32 Hen. VIII, ch. 9, forbade the sale of pretended rights or titles in land by one not in possession under penalty of forfeiture of its value one-half to the crown, one-half to him who sued therefor. The disposition of the penalty is some indication that a grant to the king was not prohibited. The purpose of the statute was to discourage corruption in the court or the use of influence " by great persons by whom the poor might be oppressed." None of these dangers might, in theory at least, occur because of the action of the sovereign. So, it is said that the assignment of a chose in action, champertous if made to a subject was valid if made to the king. (35 Law Quarterly Review, 143, 146.) This statute did not initiate a new policy. It did not prohibit what was before permitted. If it impliedly recognized as valid a grant to the king it was because such a grant had theretofore been allowed. The law in this respect has been codified by our statutes and as it exists to-day is contained in them. (*Sedgwick* v. *Stanton*, 14 N. Y. 289.) No reason exists

for giving it liberal or enlarged construction. (*Crary v. Goodman,* 22 N. Y. 170.) Accordingly it was early held that the act did not apply to a patent from the state. (*Jackson v. Gumaer,* 2 Cow. 552; *Brady v. Begun,* 36 Barb. 533.) Nor does it apply to judicial sales or to deeds under a foreclosure (*De Garmo v. Phelps,* 176 N. Y. 455), or to the conveyance of the equity of redemption (*Stoddard v. Whiting,* 46 N. Y. 627), or to a conveyance by an assignee in bankruptcy (*Stevens v. Hauser,* 39 N. Y. 302), or to a devise (*Varick v. Jackson,* 2 Wend. 166), or probably to a conveyance by executors under a power (*Bullard v. Bicknell,* 26 App. Div. 319), and it does not apply to rights appurtenant to land conveyed (*Corning v. Troy I. & N. Factory,* 40 N. Y. 191), or to lands possessed by the state (*Saranac L. & T. Co. v. Roberts,* 195 N. Y. 303, 323), or to a transfer required by a judgment (*Sandiford v. Frost,* 9 App. Div. 55), or to carry out an earlier contract of sale (*Jackson v. Raymond,* 1 Johns. Cas. 85, note). In *Candee v. Hayward* (37 N. Y. 653) Judge Grover says broadly that the act does not apply to the state. Finally sections 2031 and 2032 of the Penal Law indicate that the legislature had no thought of prohibiting a conveyance to the state itself. Such a transfer does not come within the mischief which it was desired to prevent.

This conclusion brings us to a more difficult question. The immediate grantor to the state was Mr. Webb. The conveyances to him were made while Ladew possessed the land adversely. Under such circumstances did any title pass to the state? It certainly did not acquire a greater estate or interest than Webb possessed or could lawfully convey. (Real Property Law [Cons. Laws, ch. 50], sec. 245.) What estate did he possess? What might he convey? In answering these questions we are to remember we are dealing with rules governing the alienation of land *inter vivos,* rules, therefore, having their roots in the feudal law. Reasoning based on the supposed

analogy of other rules of different origin relating to personalty is apt to prove misleading.

After the Conquest feuds might not be aliened. (2 Blackstone, 71; 1 Pollock & Maitland, 329.) They might be created. They might be resumed. Possibly this is the basis of the allowance of grants to and from the crown of land held adversely. It was but gradually, step by step, in one way and another, that the tenant acquired the right of alienation. But always this right implied that the alienee might be and actually was inducted into possession. (4 Kent, 448; Digby History of Law of Real Property, chap. 3, sec. 12.) Feoffment and livery of seisin, whether in deed or in law, fines and recoveries, release or surrender (3 Jacob's Law Dict. 65; *McGregor* v. *Comstock*, 17 N. Y. 162) — it was everywhere assumed. Or consider ejectment. The claimant at first must make a formal entry upon the land before he could constitute a lessee for years and the casual ejector must actually oust this tenant. Later while title, lease, entry and ouster must still be stated, the real defendant was only permitted to be heard if he confessed all these prerequisites except title. Possession before the tenancy might be created must still be conceded before a recovery was possible. If the transfer was by feoffment no charter was requisite. It was but evidence of the transfer and of the conditions attached thereto. (Tiedeman [3d ed.], sec. 536.) Therefore quite logically the statute of 32 Henry VIII did not declare the attempted alienation of land held adversely void. It was unnecessary. All it did was to prohibit the transfer unless the alienor had been in possession for a whole year, under severe penalties. At least by the Dukes Laws, however, a deed became necessary in the colony of New York. No alienation of lands " shall be. holden good in law except the same be done by deed in writing, under hand and seal and delivered and possession given upon part in the name of the whole by the seller or his attorney" with an exception not material here

relating to cases where the grantor himself retains posses-
sion. (1 Col. Laws, 30.) A possession in the grantor,
capable of actual delivery was still essential. Nor was
this assumption altered by our first Statute of Frauds
adopted in 1787 (1 R. L. 75) with its reference to feoff-
ments and livery of seisin only, nor by our first Revised
Statutes. (R. S. part 2, chap. 7, tit. 1, sec. 6. See
revisers' notes, 5 Edmunds, 391.)

Meanwhile the idea of possession broadened. At first
doubtless it meant actual physical occupation of the
land. Later the owner was in possession if the land was
occupied in subordination to his title or if the land was
vacant. He was never in possession if the land was
held adversely to him. Yet he might give a deed valid
in form. The deed might be recorded. Feoffments with
livery of seisin and fines, although still possible until
the time of the Revised Statutes were in little use. By
analogy with transfers of personal property it might be
believed that such a deed passed some right of entry
or chose in action. The revisers, therefore, adopted an
express provision that every grant of lands held adversely
should be absolutely void, referring to an act passed in
1801 (1 R. L. 173) which had, however, but substantially
re-enacted the statute of Henry VIII. (R. S. part 2,
chap. 1, title 2, art. 4, sec. 147.) This was an excess of
precaution. Indeed in Massachusetts, in the absence of
such a statute it has been held that at common law the
same effect would result. (*Brinley* v. *Whiting*, 5 Pick.
348.) We had already so held. (*Jackson* v. *Vredenburgh*,
1 Johns. 159.)

What was the result? Title remained in the grantor.
(*Chamberlain* v. *Taylor*, 92 N. Y. 348; *Livingston* v.
*Proseus*, 2 Hill, 526.) If he later obtains possession and
then again conveys to the same grantee, the second deed
is valid. (*Dawley* v. *Brown*, 4 N. Y. St. Repr. 406.) If he
later convey to an adverse possessor, although the latter

28

**434**          PEOPLE *v.* LADEW.

may know of a prior deed, that conveyance passes title.
(*Dever* v. *Hagerty,* 169 N. Y. 481.)   Suppose the owner's
title is divested in some other way after the void deed is
executed.   Following the reasoning of the *Dever* case a
conveyance by him to the state would be good.   Or a
conveyance by his assignee in bankruptcy.   The owner
may himself also bring an action in ejectment (*Williams*
v. *Jackson,* 5 Johns. 489) and although a recovery might
inure to the benefit of his grantee it is merely by way of
estoppel.

The grantee, therefore, might never bring an action in
ejectment in his own name.   He had obtained nothing —
no title, no right of entry, no chose in action of any kind.
He had the bare right if his grantor ever legally ousted
him in adverse possession to claim by estoppel the benefit
of that result.   And having that right we permitted him,
if his grantor assented, to prosecute an action of eject-
ment in his grantor's name.   (*Chamberlain* v. *Taylor,*
*supra.*)   But assent was essential.   If the grantor refused
there was no remedy.   (*Lawber* v. *Kelly,* 9 Bosw. 494.)

This was the situation when chapter 460 of the Laws of
1862 was adopted.   Chapter 111 of the Code of Procedure
had provided that an action should be prosecuted in the
name of the real party in interest, who, as Judge ROBERT-
SON pointed out in the *Lawber* case, was the grantor.
This section was now amended.   " But an action may be
maintained by the grantee of land in the name of his
grantor when the grant or grants are void," because of
adverse possession.   This amendment in no way changed
the rule as to the effect of void grants.   (*Dawley* v. *Brown,*
4 N. Y. St. Repr. 406.)   It conferred upon the grantor
no property rights which he had not theretofore possessed.
Its purpose may have been extremely narrow (*Hamilton*
v. *Wright,* 37 N. Y. 502.)   At most it simply permitted
him to bring the action in the name of his grantor as a
matter of course without requiring the consent of such
grantor theretofore necessary.   This is implicit in our

decision of *Smith* v. *Long* (12 Abb. N. C. 113). Under our liberal practice if this amendment conferred upon the grantee any kind of a property right he might have transferred it. His transferee might have enforced it in his own name or otherwise. But not so. The amendment conferred on the first grantee the privilege of bringing an action in a certain way and on him alone. But he had nothing he might transfer.

We cannot, therefore, believe that because Mr. Webb's grantors might have conveyed directly to the state and that had they done so the state might have maintained an action in ejectment in its own name, the same result follows when it needs trace its title through him. In the one case the conveyance is good, not void. Title passes and the right to enforce possession. In the second, nothing. The state may not acquire from Webb what he never had. If title passes, when? Clearly it is in Webb's grantors after the conveyance to Webb. It remains in them if Webb chooses to convey to an individual. Does it pass directly from them to the state when Webb delivers his deed? Or may the state question a conveyance from the same grantors to Ladew? Webb could not. We cannot assent to these propositions. And if we do not when in 1910 the rule as to the effect of such conveyance was amended by adding " the provisions of this section do not apply to a grant of such property made to the People of the state of New York, nor to a person where the title granted to such person shall thereafter, by grant or mesne conveyance become vested in said People," we think more was effected than a mere change of procedure. Were that all the statute might be construed as retrospective in operation. But it alters the substance of the law. It provides for a transfer of title. At present the statute states that such a series of transfers as that before us would vest title in the People. They may sue and recover in their own name. This being so, under well-settled principles of construction we

must treat the act as prospective only. Our conclusion is, therefore, that the state never acquired record title to the islands in question.

3. As to adverse possession. The state having failed either to show title to the land in dispute or possession prior to that of the defendants may not succeed in this action. As, however, because of the exclusion of the evidence necessary to show the invalidity of the tax deeds a new trial must be granted, it would be well for us to express our opinion upon the alleged title of the defendants, dependent upon adverse possession. This action was begun in July, 1914. Forty years from that time would take us back to 1874. Twenty years to 1894. It may well be that if the forty-year statute applied the defendants never acquired title. The nature of Murray's possession as found was not adverse. Dunning's possession, even if adverse, is found to have begun in 1874. It is not said, however, to have begun before July and there is no evidence to that effect. In truth it is to the contrary. Ladew's possession in 1891 was adverse and continued to be so. As against the true owners he gained title in 1911. The state not being in any sense the owner we are not concerned with the longer statute.

The judgment appealed from should be reversed and a new trial granted, with costs in all courts to abide the event.

CARDOZO, J. (dissenting). Assignments of choses in action, though often stated to be invalid at common law, were effective from early days to the extent of empowering the assignee to sue and recover judgment in the name of the assignor (1 Williston, Contracts, §§ 408, 410). The power thus conferred might be delegated; and so the result was brought about that the name of the assignor was available to sub-assignees or successive buyers as fully as it had been available to the first buyer in the

series (1 Williston, Contracts, § 410, at p. 758; *Suther-land* v. *Reeve,* 151 Ill. 384, 393; *Dawes* v. *Boylston,* 9 Mass. 337, 346; *Dexter* v. *Meigs,* 47 N. J. Eq. 488). What was thus acquired, even if something short of ownership, was, for many purposes at all events, the equivalent of ownership (cf. Cook, Alienability of Choses in Action, 29 Harvard Law Rev. 816, 821, 828, 834, 835; 30 id. 449; Williston, Right of an Assignee in a Chose in Action, 30 Harvard L. R. 97; 31 id. 872; 1 Williston, Contracts, § 446). Procedural forms might obscure realities; equitable origins might leave their stamp upon the quality of the right or the extent of the dominion; but with all these deductions, the outstanding fact was left that there existed a device by which even against the protest of the creator of the power, successive assignees could gain the right to sue (Williston, *supra,* § 446; *St. Albans Granite Co.* v. *Elwell & Co.,* 88 Vt. 479). This was alienation, however procedure or words might incumber or disguise it (*Bouvier* v. *Balt. & N. Y. Ry. Co.,* 67 N. J. Law, 281, 293; *Dawes* v. *Boylston, supra; Parsons* v. *Woodward,* 22 N. J. L. 196; Cook, *supra,* 29 Harvard L. R. at 834). "It is laid down in our old books," said BULLER, J., writing in 1791 (*Masters* v. *Miller,* 4 T. R. [Durnford & East] 320, 340), "that for avoiding main-tenance a chose in action cannot be assigned, or granted over, to another (Co. Litt. 214a, 266a; 2 Roll. 45, 1, 40). The good sense of that rule seems to me to be very questionable and in early as well as in modern times it has been so explained away that it remains at most only an objection to the form of action in any case." Already in those days realities had triumphed over names. Modern statutes, in permitting or requiring an assignee to sue in his own right, have changed the remedial form. They have not greatly changed the substance of the interest which the remedial form protects, and this whether the interest be classified as equitable or legal (1 Williston, Contracts, § 446; Williston, 31 H. L. R. 822; Cook, 29

H. L. R. at 834; 30 id. at 471; *Beckwith* v. *Union Bank of N. Y.*, 9 N. Y. 211; *Myers* v. *Davis*, 22 N. Y. 489, 490; *Mayhew* v. *Pentecost*, 129 Mass. 332, 335; *Am. Lith. Co.* v. *Ziegler*, 216 Mass. 287, 289; *Joseph Dixon Crucible Co.* v. *Paul*, 167 Fed. Rep. 784, 786). " The question whether a suit upon a chose in action shall be brought in the name of the assignor or of the assignee is a question of form of remedy only, and is to be determined by the *lex fori* " (*Mayhew* v. *Pentecost, supra;* citing *Warren* v. *Copelin*, 4 Metc. 594, 597; *Foos* v. *Nutting*, 14 Gray, 484).   Even at common law, however, restrictions upon assignability, whether affecting form or substance, were relaxed in exceptional cases (1 Williston, Contracts, § 406), of which one only is important here.   The king might receive an assignment of a chose in action, and sue in his own name (Ames, Lectures on Legal History, p. 210; Winfield, Choses in Action in Relation to Maintenance, 35 Law Quarterly Rev. 143, 146; Williston, *supra*, § 410). It was another phase of the same exception that the king might take a conveyance of lands adversely held, and gain a right of entry (*Brady* v. *Begun*, 36 Barb. 533; *Candee* v. *Hayward*, 37 N. Y. 653, 656; 1 Halsbury Laws of Eng. p. 55; 32 Hen. VIII, ch. 9).   In both these situations, the privilege, once attaching to the king, to-day attaches to the state (*Brady* v. *Begun, supra; Candee* v. *Hayward, supra; U. S.* v. *Buford*, 3 Pet. 12).

Our simplified procedure has brought assignees into the open, but there remains one situation in which the law keeps them under cover.   The statutory rule (Code Civ. Pro. § 1501; Civ. Prac. Act, § 994) that the grantee of lands adversely held must sue, if at all, in the name of his grantor, remains as a curious survival of procedural complexities now generally extinct (Civ. Prac. Act, § 210; Code Civ. Pro. § 449; cf. Code Civ. Pro. §§ 1909, 1910; Pers. Prop. Law [Cons. Laws, ch. 41], § 41).   Ownership of the land is still in the grantor, but the grantee is put in the same position in which the assignee of a chose in action

stood at common law, with a like privilege to sue (*Dever v. Hagerty*, 169 N. Y. 481, 484). The extension of this privilege to subsequent grantees throughout the series would have been supported by common-law analogies (*Sutherland* v. *Reeve; Dawes* v. *Boylston, supra*). This court, however, in *Smith* v. *Long* (12 Abb. N. C. 113), read the statute narrowly, and held that the privilege belonged to the first grantee of the disseisee to the exclusion of all others. The ruling was placed upon the ground that a different construction would " encourage dealings in such claims to real estate," and thus nullify the public policy reflected in the statute. I am unwilling to extend the ruling to a transfer to the state. If the state had received a conveyance from the disseisee or first grantor, it might have sued in its own name, for it was excepted by implication from the general prohibition. For like reasons it is excepted from the prohibition which public policy is thought to have laid upon the first grantee. Just as traffic in lands was permissible between subject and sovereign, though the lands were adversely held, so also was traffic in choses in action generally. The king might sue in his own name if he held an assignment from the subject. The subject might sue in like form if he held one from the king (*Bouvier* v. *Balt. & N. Y. Ry. Co., supra*). I cannot doubt, therefore, that the conveyance by the intermediate grantee was effective to clothe the state with the right to sue somehow, whether in its own name or another's. The only question is whether it must take the chose in action with the procedural limitations that affected enforcement while the chose was in the hands of the intermediate grantee, and sue, not in its own name, but in that of the original grantor. To my thinking, however, we stretch beyond analogy or reason a rule which as it exists to-day is at best a barren archaism when we maintain these procedural limitations after assignment to the sovereign. If the first grantee is in the same position as an assignee of choses in action generally at

common law, and may make a valid sub-assignment whenever such sub-assignment would not offend the policy of the law, I think the sub-assignee, the state, may sue in its own name to the same extent that it might have sued under an assignment first in order. In holding to the contrary, we exalt appearances and names over substance and realities. The right to sue in some form indisputably passes. All else is mere procedure. The limitation upon the remedy gives way to the sovereign's prerogative.

If these conclusions are correct, the recent amendments of the statute are declaratory of pre-existing law. The state does not need their help to sustain its cause of action.

The judgment should be affirmed with costs.

HISCOCK, Ch. J., POUND, McLAUGHLIN and CRANE, JJ., concur with ANDREWS, J.; CARDOZO, J., reads dissenting opinion.

Judgments reversed, etc.