ST. WILLIAM'S CHURCH, RAQUETTE LAKE, NEW YORK, Respondent, *v.* THE
PEOPLE OF THE STATE OF NEW YORK, Appellant.

Opinion in the trial court:

BREWSTER, J.   In this action to compel a determination of defendant's claim
to the real estate described in the complaint, plaintiff established a prima facie
case by its proofs of the statutory requisite of a possession thereof, a title
thereto, and of the existence of defendant's claim of title thereto which, unless
good, is unjust.· (*Vanderveer Crossings* v. *Rapalje,* 133 App. Div. 203, 205;
*Ford* v. *Belmont et al.,* 69 N. Y. 567, 570.)   Defendant, in addition to its
denial of the essential allegations of the complaint, took the affirmative, pleaded
title and sued for appropriate affirmative relief.   The issues thus presented
for decision require an examination of the proofs of title submitted by the
parties and a determination as to whether defendant's proofs are sufficient
to discharge the onus placed on a plaintiff in ejectment, and if they are not,
then a declaration and determination of such "interest" in the lands in ques-
tion as the proofs establish to be vested in it.   (Real Property Law, § 504.)

The defendant has made proof a record title which extends back to and into
itself as sovereign in 1786.   While incomplete as not embracing the whole title,
in that the proofs disclose the gap of some outstanding titles to certain undivided
interests, still as against the plaintiff I regard it as sufficient to entitle defendant
to the affirmative relief it seeks unless it has been overcome or its right to
possession against the plaintiff is stalemated by latter's proof of its title.

I am unable to find that plaintiff has established any such paper title.   Its
proofs of such a title, so far as I can ascertain, extend back only to 1899, to
the Dunning deed.   It is there unconnected with a sovereign or any earlier
source.   True, as contended by the plaintiff, its proofs disclose evidence of
another paper title which may, in some remote way, be related to a sovereign
source.   This came about as follows: By 1899 one Webb had acquired titles to
certain undivided interests in a large tract of 7,000 acres in Township 40,
Totten and Crossfield's Purchase, wherein premises in question are situated.
They covered an undivided four twentieths of the large tract plus three fifths
of an undivided one eighth which had been outstanding in the heirs of one John
Lawrence from a very early date, less whatever one Mead had previously effec-
tively conveyed out of his undivided ownership to one Durant in 1880.   At
this time the State had accumulated a paper title to all of the 7,000 acre tract.
This consisted of a tax deed from the tax sale of 1871 as to an undivided one
half thereof, and a referee's deed from the so-called Waldo partition of 1884
(herein later referred to) which purported to convey the other undivided one
half.   In 1897 Webb conveyed one of said twentieths to the State, that being
all he then owned.   With this state of affairs existing, on May 5, 1899, Webb
conveyed to plaintiff's predecessor in title "15 acres," undefined and unlocated,
but to be determined and located by said grantee with the approval of the
defendant State.   At this time Webb was in readiness to convey all of his
other title and interest in the 7,000 acre tract to the State and this was accom-
plished shortly after and on May 8, 1899.   Not long after that the aforesaid
grantee, the railway company, received from Webb and recorded a deed,
acknowledged November 6, 1899, to a parcel of land, precisely described pur-
suant to survey, and consisting of 11.873 acres, for railway purposes which it
so used for many years.   This parcel of land did not include the premises
in question.   Neither the State nor any other owners of titles to undivided

interests in the 7,000 acre tract, which deraigned from a sovereign source, ever made any other conveyance to said railway company. Up to this point it would seem clear that the railway company had accepted the 11.873 acre parcel as the equivalent of, and as and for, the fifteen acres previously conveyed to it by Webb under the arrangement aforesaid, and which he reserved out of his aforesaid grant to the State. The situation thus remained until 1909 when a partition suit was brought by the State against Bell & Golding. The latter had by then acquired title to an undivided six-twentieths of the 7,000 acre tract which had previously been outstanding in the heirs of one Abner Benedict. Apparently this suit was instituted upon the understanding of the State that its 1875 tax deed from the 1871 tax sale was void. Such, too, had evidently prompted the State's purchase from Webb. It was later so pronounced by the Court of Appeals. (See *People* v. *Inman*, 197 N. Y. 200; *People* v. *Ladew*, 237 N. Y. 413, 423.) The aforesaid partition suit proceeded to completion by an actual partition between the parties. The railway company was not made a party thereto and therein the aforesaid 11.873 parcel was specifically set off and partitioned to defendant Bell who later conveyed it to one Moynehan who thereafter conveyed his title thereto to such railway company. Plaintiff contends that since its predecessor, the railway company, had become vested under this first deed from Webb with fifteen acres unallotted, and since it was not a party to the aforesaid partition suit, such undivided interest has never been partitioned, and thus that its grant from the railway company's grantee relates its present paper title to a sovereign source. If this be tenable it seems to me difficult, if, in fact, it is permissible, within the jurisdiction which may be exercised in this action, to determine what titles or equities there may be in the plaintiff as regards the title which the State has secured from former tenants in common to various undivided interests, and in my view of the issues which are presented it is, I believe unnecessary, even if it be permissible, to attempt a solution of this complication referred to.

Apart from its record and paper titles plaintiff has presented proofs of a title which it claims to have acquired by the adverse possession of said lands by its predecessors. This claim has a twofold aspect. It rests upon different and independent premises. One of these has its genesis in an occupation begun by one Alvah Dunning in 1882, nakedly and by sheer occupation, and the other in an occupation commenced by the Raquette Lake Railway Company on May 25, 1899, under a color of title.

As to the former premises of the claim the evidence establishes that in the spring of 1882 Alvah Dunning built a dwelling house and located his home upon and went into actual and exclusive occupation of a tract of land which bordered upon Raquette Lake. No public road then led to this location or near there. The nearest such highway was many miles away. The only means of access to or egress therefrom was either by foot or horseback over primitive trail or by natural waterways and their incidental carriers.

It is a matter of general knowledge and a well-known fact that Alvah Dunning was one of the last of a rather long line of famous nineteenth century Adirondack guides; that at least prior to 1865 he had taken up a rather hermit-like existence in the then remote wilderness area of what is now known as Township 40, Totten and Crossfield Purchase, and vicinity. He thus lived at various places in the vicinity of Raquette Lake for many years. When established on a given location, his simple wants were mostly supplied by trapping, hunting and fishing, and occasional service as guide to the hardy few who were then

wont to venture that far into what was then generally known as the "Great North Woods".*

He enters the law reports of our State first in *People ex rel. Marsh* v. *Campbell* (143 N. Y. 335) and we meet him again in *People* v. *Ladew* (189 N. Y. 355) and again in *People* v. *Ladew* (237 N. Y. 413, *supra*). In these later reports as well as in records of reliable history, we find him living on Osprey Island in Raquette Lake as early as 1869. History records that he had moved to Raquette Lake as early as 1865 where he first made his home on Indian Point, later taking possession of a camp originally built by Rev. "Adirondack" Murray, for whom he guided, and which was located on Osprey Island, to which he moved in the fall of 1869. At that time he was past middle life, and when, in 1881, he sold out to Durant and moved away from Osprey Island he next settled upon the location first referred to. There the evidence is that he cleared land and erected a relatively substantial dwelling house. Nearby he cultivated and raised crops and vegetables. He shaved and sold shingles. He was unsociable and appears to have succeeded in being rather generally ignored. He took what store from the premises near about him that he chose and from such facts regarding him as are shown by the evidence, and regardless of what is also well known and recorded in reliable history, it is, I believe, a fair inference that when he cleared the land and built that dwelling, he intended it, as the evidence shows he was often wont to call it, his home, thus shedding and forswearing his erstwhile semblance of a nomad. In fact, his adherence to Osprey Island through all the vicissitudes of the intrusions upon him there, could we consider that, indicates that long prior to 1882 he had chosen upon a more settled existence.

He remained upon this last location, which involves the land in suit, continuously for seventeen years, living there as aforesaid until 1899. He had forcibly and successfully resisted attempts to evict him from Osprey Island. Later, when persuaded to sell out there, he executed a deed and left peacefully. It is a matter of well-known history that by 1881 summer residents and some others had begun to penetrate as far as some of the northerly and easterly shores and points on Raquette Lake. Dunning's last choice of a location seems to have held promise for the seclusion which he evidently desired. The natural terrain there afforded reasonable grounds for his expectations. There was a knoll or slight height of ground of a few acres near the lake shore. This was suitable for the site of the dwelling he built. The area immediately surrounding this was low, swampy and undesirable to others, and, at least most difficult if not impossible for ordinary travel. This character of the land extended to the south and west of the knoll and also to the north until met by the acclivity of a rather abruptly raised plateau, the slope of which was referred to during the trial as the "hillside". Thus he located in a place where, according to the conditions of the times, it would seem that he could have

---

* The unique habits and traits of the man are recorded in Donaldson's "A History of the Adirondacks" (The Century Co., 1921). In volume II of this work, chapter XXXVII is exclusively devoted to him, and in its opening it is stated that he had those traits "that entitle him to be considered as the real Adirondack prototype of a primitive man. His whole nature slanted back to the beginnings of things and resented the poachings of progress. He sought solitude and provender in the woods, not beauty. He had a troglodytic dislike of neighbors, a primal tendency to warfare with them, and a savage streak of cruelty."

reasonably considered that he would be free and fortified from intrusion and trespass. It was moated: on the east by a section of the shore line of Raquette Lake, which was low, swampy land; by a marshy swamp which extended to Brown's Tract Inlet on the south, and to a long distance on the west; while on the north was more swampy land and the hillside aforesaid. After locating there he was successful in finding the loneliness he sought for seventeen years and until the sudden advent of a railroad which was projected into the wilderness fastness at the turn of the century.[*]

It was on May 25, 1899, that he agreed in writing to sell to the Raquette Lake Railway Company all his right, title and interest "in and to all that tract or parcel of land situate in the town of Long Lake, County of Hamilton, and State of New York, known and distinguished as Township Number Forty (40), Toten & Crossfield's Purchase and being all of the lands now or formerly owned or occupied" by him "lying and being on the westerly side of Raquette Lake together with three boats, stores and furniture at the camp on said lands." By that agreement he also agreed, at his own proper cost and expense, to execute and deliver to the said vendee "a good and sufficient deed free and clear of all liens and encumbrances of said premises." By his agreement to sell he gave possession of said premises forthwith and it was on June 24th following that he executed and delivered a deed in fulfillment of his contract. The evidence is that to obtain data for the preparation of the deed, he pointed out to the surveyor the bounds of the lands thus occupied and claimed by him and, as so described in his deed, they correspond to the boundaries heretofore stated. The land thus deeded includes most of the hillside and all of the premises in suit.

---

[*] Donaldson, in his "A History of the Adirondacks" (*supra,* Vol. II, pp. 114–115) describes Alvah Dunning's reaction to the advent of that public utility, as follows: "But one day a stranger appeared on the scene, armed with legal papers, legal phrases, and bank-bills. He explained to Alvah that the site he occupied was needed for a railway station, and offered to pay him for vacating it. The announcement that a locomotive was actually to come puffing and screeching to the very shores of his sanctum, affected him much as if he had been hit by it. He was simply stunned into docility. Instead of offering to shoot the stranger, he meekly accepted the money and agreed to move out. But his spirit seemed broken. 'I guess I've lived too long,' he said, with a real tear in his voice. 'I used to hope I could die in peace in the wilderness where I was born, but if I don't slip my wind pretty quick, I guess there ain't going to be no wilderness to die in. I've heerd tell the Rockies was bigger. I guess I'll go out yonder and hunt for a quiet corner out o' reach of tootin' steamboats and screeching en-gines'.

"And he did. This old man of eighty-three, who felt himself jostled and elbowed out of overcrowded woods, wandered forth across the continent in a last, long quest for solitude and peace. The parting seemed to pull at his heartstrings as nothing else had ever done before. He even went around and said good-by to his friends among the summer campers, most of whom had always treated him with charity and kindness. He seemed to realize it now more than ever. His farewells were not effusive, but their simplicity was touched with solemn pathos. There was something in them after all of royal abdication. · Here was a rude king of the woods leaving his inherited domain — a *Lear* of the forest being driven out into the night."

The evidence as to the precise extent of the area of land actually occupied in the required sense of the statute, and thus adversely possessed, by Dunning from 1882 to his said conveyance in 1899, while sparse and within a narrow compass, nevertheless presents, to me, a fair question of fact, and such as it is, along with the inferences which may be drawn therefrom, considered in the light of what the evidence shows as to the conditions of the times, the character and culture of the locality, the nature and bounds of the location which he chose, settled upon, and occupied, and the character, temperament, habits, and nature of the man and his surroundings, as disclosed by the evidence and without regard to history, all these convince me that his occupancy was sufficiently actual as regards all of the area he described in the deed which he gave, so that the requisite element of actual occupancy in the gaining of a title thereto by adverse possession, was fulfilled. That such occupancy was hostile to all the world, that it was open, notorious, and continuous has been abundantly proven.

After Dunning's grantee, plaintiff's predecessor, the Raquette Lake Railway Company, procured this deed, and with the construction of the railroad to the very shore line of Raquette Lake, the occupancy of such lands became far different in nature and more intensive in degree. The deeds which the railway company later procured from various sources to portions of land embraced within the Dunning grant did not, it seems, affect the completion of title or the continued ripening of a title by adverse possession. This seems certainly true as to the lands in question since I cannot find that they were included in such later deeds. And, the character of the continued occupancy and possession by the railway company of the lands embraced in the Dunning deed was such that the general rule seems applicable that an adverse claimant may purchase an outstanding title or interest without necessarily interrupting the continuity of his adverse possession or of losing any rights under his adverse claim. (2 C. J. S., Adverse Possession, § 151, and cases cited.)

From 1899 on down to 1902, and beyond, the "hillside", within the bounds of the Dunning deed, appears to have been a location much used. With the construction and completion of the railroad the hamlet or village of Raquette Lake rapidly developed and expanded, and the hillside appears to have been as much an integral part of it, in use and occupation, as any other portion of the settled community. Most of its timber was cut off, it was built upon, dwelt upon, used for pasturage, gardening, roads and other purposes and improvements, freely, openly and notoriously, and under claim of right and title. All this the evidence shows to have occurred and to have been done by the railway company, and its agents and tenants, by its direction or with its sufferance, and to have continued down to 1903, and beyond, without let, hindrance, or permission from the owners of any of the underlying title or any other claimant.

In 1909 (through the Bell-Golding partition) the State acquired additional titles which pertained to the ownership of certain outstanding undivided interests in the 7,000 acre tract. Since then it has from time to time asserted various claims to all or certain parts of the lands in Raquette Lake hamlet situate on the hillside aforesaid. This seems to have been concomitant to the beginnings of a routine development of the State's policy as to lands to which it claimed title within the Adirondack Park and the Forest Preserve, and supplies the record with various acts and negotiations illustrative of those inquiries, disputes and controversies which a title acquired by adverse possession naturally pro-

vokes. The disclaimer of title to a seventeen one-hundredths of one acre of land upon the hillside in 1913 is an instance of this. Such disclaimer, if construed as equivalent to a grant, may have been effective to extinguish the title of the disclaimant to the land therein described, but in probative force it seems more effective as an assertion than as a relinquishment, of a claim of title to the remainder of the hillside which continued in the occupancy of the disclaimant. A disclaimer of title as to a part or fraction of the land will not affect claimant's adverse possession of the rest. (2 C. J. S., Adverse Possession, § 148, citing *Barnett* v. *Templeman*, 31 S. W. 78 [Tex.]; 2 C. J. S., Adverse Possession, p. 101, note 15.) It is also to be noted that the disclaimer was long after the lapse of a continuous twenty-year occupancy, and it seems that the recognition of title in another after the full statutory period has run in favor of claimant will not reinvest the title previously acquired by adverse possession. (2 C. J. S., Adverse Possession, § 57, citing *Shirey* v. *Whitlow*, 80 Ark. 444.) Moreover such disclaimer and all other things done by the railway company at the request of the State and upon which it relies as a recognition of its title seems ineffective as a recognition of titles outstanding in third parties to undivided fractional parts, and against which adverse possession was available.

Pursuing the inquiry further as to whether the State has succeeded in its affirmative plea, I find as follows: It parted with its sovereign title to all of Township 40, Totten & Crossfield's Purchase, in 1786 when it issued its letters patent thereof to Robert Gilbert Livingston. When Alvah Dunning started his adverse possession in 1882, the State had not reacquired any valid title to any part of the premises which he occupied, or to any of the 7,000 acre tract in said Township 40. The evidence is that at that time the underlying title to said tract was distributed among several owners as tenants in common and in various shares.

Two years after the Dunning occupation began, came the so-called Waldo partition. The State now relies upon a referee's deed from the partition as its title to an undivided one half of the said 7,000 acre tract. At the time it was brought Abner Benedict, a former owner of the whole township, except an undivided one eighth outstanding in the heirs of John Lawrence, had previously conveyed out of his interest and title an undivided one quarter to Mark H. Beecher and another undivided one quarter to Ruel Keith. This latter one quarter had become vested in one Lindsey and one Blanchard. Beecher had died testate and in his will he had named five executors to whom he gave a general power of sale as follows: "I give to my executors power to sell any of my real estate, when, in the judgment of the majority of my said executors, it may appear, for the best interest of my estate so to do." He then gave to two of the executors, viz: Aarad Thomas and Homer D. Waldo, exclusive power to carry into execution the determination of the majority of the executors in their acts under the will and in execution of any deeds of conveyance thereunder. By his will Beecher had devised his real estate in various shares to a large number of beneficiaries. Four of the executors then conveyed the testator's interest in the 7,000 acre tract to the other one, the said Homer D. Waldo, in his individual capacity, and he thereafter commenced the so-called Waldo partition suit, as an individual and as sole plaintiff. The only defendants were the People of the State of New York, the said Lindsey and Blanchard and their and plaintiff's respective wives. The partition suit went on to completion. A sale of the entire premises was directed at which the State purchased and received the referee's deed thereof. All this was confirmed

by final judgment of the court. Before the referee appointed by the interlocutory judgment, Waldo testified as follows: " While the title to an undivided ¼ of this land is in me, the equitable interest is in the legatees under the Will of Mark H. Beecher. There are about forty legatees who are entitled to a distributive share. The land. is unproductive and it is their desire and interest to have it sold and in my opinion it would be greatly to their detriment to have an actual partition. Under the Will it would be absolutely necessary to sell in any event to convert the realty into money ".

The plaintiff here contends that the State's deed from this partition suit was ineffectual to convey any title in that the court did not have jurisdiction to render a valid decree. This, because Waldo, the plaintiff, was not a person authorized by law to institute a partition suit, he not being either a joint tenant or a tenant in common. (Civ. Prac. Act, § 1018, formerly Rev. Stat. of N. Y., part III, ch. V, tit. II, § 6.) The plaintiff contends that an executor may not sue for the partition of real estate even when he has been given a power of sale (8 Carmody on New York Pleading and Practice, § 388; *Evans* v. *Appell*, 211 App. Div. 105, 109, affd. 240 N. Y. 585; *Pattison* v. *Cusack*, 147 App. Div. 428, 432; and *United States Trust Co.* v. *Smith Co.*, 141 Misc. 315, 316) and that in effect that was what the plaintiff Waldo did. However, it has been held that where one other than a joint tenant or a tenant in common sues in partition, the defect is not necessarily jurisdictional and a sale made and confirmed by formal judgment has been deemed conclusive upon all parties thereto. (8 Carmody on New York Pleading and Practice, § 373, citing *Harrison* v. *Higgins*, 218 N. Y. 556; *Cromwell* v. *Hull et al.*, 97 N. Y. 209; *Prior* v. *Prior*, 49 Hun 502; *Reed* v. *Reed*, 46 Hun 212; see, also, *Blakely* against *Calder*, 15 N. Y. 617; *Howell* v. *Mills et al.*, 56 N. Y. 226; *Sullivan* v. *Sullivan et al.*, 66 N. Y. 37.) The court which entertained jurisdiction of the Waldo partition had jurisdiction of the subject matter and of all who were made parties thereto. The defect was that the plaintiff was not the real party in interest and fully vested with the right of action upon which he sued. He was without remedial interest. But this, too, has been held not to raise a jurisdictional question. (See 47 C. J., Parties, § 45, citing *Tobias* v. *Richardson*, 26 Ohio Cir. Ct. 81, and also to the effect that where a beneficial ownership and the legal title to a chose in action are separated, the beneficial owner's rights may be protected by the bringing of an action to his use in the name of the legal owner as nominal or legal plaintiff.) In *Blakely* against *Calder* (*supra*) the plaintiff was a remainderman having an undivided one-fifth interest subject to a certain life estate. Action was partition. A sale was decreed. The purchaser refused to complete his purchase, claiming his title defective because plaintiff had no standing to maintain an action of partition and for that reason the court was without jurisdiction to order sale. But the title was held good and purchaser directed to complete, the court, at page 622, saying: " The Supreme Court is one of general jurisdiction in law and equity, and has jurisdiction of all actions for partition. When this case was presented, it was its province to decide whether it was a proper one in which to award a partition or a sale, and if its decision was erroneous, the remedy was by appeal."

In *Howell* v. *Mills et al.* (*supra*) the plaintiff who instituted the action (George W. Hurtin) was the owner of a vested remainder in an undivided half of the premises involved subject to life estate of his father. A sale was decreed. Plaintiff's successor in title (Howell) was substituted as party plain-

tiff. The owner of the life estate and others appealed from judgment of trial court directing a sale. At page 229 the court said: "The only question which can be considered, and this is urged on behalf of the defendants, is that the court has no 'jurisdiction to entertain these proceedings. This is predicated upon the ground that the petition does not show that the plaintiff was entitled to bring the action, or that the facts stated in the petition brought the case within the statute authorizing the court to entertain an action for partition. The interest of the plaintiff in the premises was a vested remainder (subject to a life estate) in an undivided half, and a contingent remainder in the other half, dependent upon the death of his brother without issue; and the brother had a like interest. Whether the Supreme Court erred or not, we think the unanimous decision of this court, in *Blakely* v. *Calder* (15 N. Y., 617), is decisive upon the question of jurisdiction. The precise question involved here was involved in that case; and we should hesitate about disturbing the decision, if we doubted its correctness, but it is proper to say that we approve of it. The Supreme Court possesses general jurisdiction in law and equity, and exercised jurisdiction in law prior to the statute. (47 N. Y., 21.) The proceedings, it is true, must be regulated by statute, but it is competent for the court to determine whether the statute has been complied with. In this case the court acquired jurisdiction of the parties; and it had jurisdiction of the subject-matter. If it erred, the error could only be reviewed by exceptions properly taken."

In *Cromwell* v. *Hull et al. (supra)* an action was brought to foreclose a mortgage. The purchaser on the sale refused to complete his purchase, claiming an unmarketable title because of a link in the chain of title which was the result of a sale under decree in an action of partition instituted by a life tenant some twenty years previous. At pages 211–212, the court said: "If the plaintiff in the partition suit was not authorized to maintain the action because not a joint tenant or tenant in common with the remainderman, still the defect was not jurisdictional, and the decree, if erroneous, not absolutely void. The court had jurisdiction of the subject-matter of the action and of the parties, and if it determined incorrectly in awarding to the plaintiff a relief to which she was not entitled, the error should have been corrected on appeal." (Citing authorities.)

In *Harrison* v. *Higgins (supra,* pp. 558–559) the court said: "Where partition is brought by one not a tenant in common, the defect is not jurisdictional, and a decree of sale is not void. It was so held in *Cromwell* v. *Hull* (97 N. Y. 209), where a tenant for life brought partition against remaindermen."

However, I do not agree with the defendant's contention that we are precluded from examining and passing upon the question as to whether it secured a valid title from the Waldo partition, upon the ground that to do so would involve an unauthorized collateral attack upon the judgment rendered in this case. Here we have a situation where the defendant asserts against the plaintiff a title which came from a sale in partition. In a sense the defendant seeks to oust plaintiff from possession, as in ejectment, in reliance upon its evidence of ownership and right to possession. In the discharge of this burden of proof it presents the referee's deed which emanated from a partition suit as a part of its title to the premises in question. A total lack of jurisdiction of the parties in whom the Beecher title was vested at the time of the partition seems to make it permissible for the plaintiff to question the sufficiency of defendant's proof of title. See *O'Donoghue* v. *Boies* (159 N. Y. 87, 98) wherein it is stated: "The question therefore, is not what has been decided by the

court in which the sale was ordered, but what it had jurisdiction and power to do. When a party interposes the judgment of a court as the foundation of his title or claim, the want of jurisdiction in the court to render the judgment may always be set up against it when sought to be enforced, or when any benefit is claimed under it by the party in whose favor it was rendered, or by any one claiming under him. * * * No court * * * can acquire jurisdiction by the mere assertion of it, or by erroneously alleging the existence of facts upon which jurisdiction depends. If the court had no jurisdiction, it had no power to make a record, and the supposed record is not in truth entitled to the character of a judgment."

The foregoing is from the opinion of O'Brien, J., on a question therein as to which the Court of Appeals were evenly divided. It has been said that the right of a plaintiff to maintain a suit, while frequently treated as going to the question of jurisdiction, in reality goes to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it. (See 21 C. J. S., Courts, § 35, p. 44 and cases cited.) However this may be, here in the instant case we are called upon to determine whether the deed which the defendant received from the Waldo partition vested in it a title which is impregnable when offered by a plaintiff in ejectment against a stranger whose title is not connected with its source. A defendant in ejectment who is in possession under color of title or right may generally avail himself of an outstanding title in the third person, as a defense, even though he does not connect himself with such title. (28 C. J. S., Ejectment, § 39.) In order to do so the outstanding title must be one which is a present, subsisting and available title upon which the owner thereof could recover. (28 C. J. S., Ejectment, § 40; *Hoag* v. *Hoag*, 35 N. Y. 469, 473.) As regards the question involved plaintiff is as a defendant in ejectment. (Real Property Law, § 504.) Since in the Waldo partition there was a total lack of jurisdiction of Beecher's devisees, we are therefore called upon to determine whether the defect alluded to results in the testator's title still being vested in them or their heirs and not in the State. In my opinion, under the proofs, we are forced to this determination and the making of it does not involve an unauthorized collateral attack upon the judgment which was rendered.

To me defendant's proofs make it evident that the Waldo partition was availed of, among other reasons, as a means of the execution of the power of sale which the testator had given to his executors. The four executors' conveyance to Waldo, the other executor, patently was a mere step in that arrangement. While the method employed was not in strict conformity to the directions of the will, it was substantially so. This seems implicit in the judgment rendered. Waldo's receipt of the conveyance to himself and his subsequent institution of the suit in partition indicates a concurrence by him and his coexecutor, Thomas, in an execution of the power given to them exclusively to "execute and deliver, all deeds and other writings which shall be required to be made on the sale by executors of my property." Thus upon receipt of the deed I think it may be said that Waldo held the legal title to the undivided one quarter whereof his testator had died seized. Rightly or wrongly, the judgment in the partition suit so adjudicated. As to the subject matter and the parties who were before it, the court had power to so decide. A substantial sum of money was secured upon the sale. There is no evidence but that it was subsequently distributed to the beneficiaries under the will. Even though the latter were not under the jurisdiction of the court in the partition suit, may we now say that in them is vested such a present, subsisting,

operative and legal title to the quarter interest which their testator had devised to them, that upon it they could now recover? These beneficiaries were some forty in number in 1884. Fifty-eight years have since elapsed. Could they or their descendants be found, they would probably constitute a far greater number. Should the seemingly well-nigh impossible be accomplished and they and their descendants were found, it is, of course, unknown as to whether they or any of them would be desirous of questioning the 1884 partition judgment as to which they have remained silent during all those years. Should they do so it might be necessary for them to restore the fruits of the judgment which they and their ancestors received and this with interest. All of this, of course, is problematical and uncertain and in my opinion it does not present the situation of a defect in the defendant State's title which is sufficient to defeat it when offered as proof of title in ejectment.

When, therefore, the State acquired such title, it became seized of a title which in the following year, and by virtue of sections 7 and 8 of chapter 283 of the Laws of 1885 it held, and since 1894 by force of organic law it has continued to hold, not as a proprietor but as sovereign in trust for the public. As such it was inalienable. (N. Y. Const. of 1894, art. VII, § 7; now, N. Y. Const., art. XIV, § 1.) The only exception to its inalienability was as to a title to an undivided interest which perforce was alienable by suit in partition. It could not be extinguished by adverse possession. (*People* v. *Baldwin,* 197 App. Div. 285, affd. 233 N. Y. 672.) While I have found no case where the rule of the *Baldwin* case (*supra*) has been applied to the State's ownership of title to an undivided interest in such lands, we must, I feel, be guided by the rule that no divesture of a sovereign title to land by adverse possession can occur except where the statute permits it. I know of no such statutory permission. In my opinion we may not infer one from a general statute in face of the statutory pronouncement of 1885 and its later incorporation into the Constitution. Even though adverse possession may extinguish an equitable title owned by the State (*People* v. *Brooklyn Cooperage Co.,* 187 N. Y. 142, 155, 156), it seems to me that here, through the Waldo partition, the State gained a legal title which excepted it from the rule enunciated in the case last cited, even though it might require the aid of equity to perfect it or effectuate its full beneficial enjoyment.

The Mead, Hay, Sackett and Platt titles to an undivided four twentieths of what in 1852 Abner Benedict conveyed to them of the 7,000 acre tract, and also three fifths of the title outstanding in John Lawrence, or his heirs, to an undivided one eighth of the entire township, were acquired by William Seward Webb in 1896, 1897 and 1899, less, however, such thereof as Mead had effectually conveyed to Thomas C. Durant in 1880. This latter conveyance, acknowledged April 13, 1880, was for "1,000 acres of land undivided * * * said land being part of a certain tract of 7000 acres" and it describes the 7,000 acre tract aforesaid. Mead then appears to have been the owner of an undivided three twentieths of the tract.

All of that which Webb acquired as aforesaid, he had conveyed to the State by May 8, 1899, excepting "15 acres" which, three days before then he had conveyed to the Raquette Lake Railway Company, and which was to be located by the grantee in accordance with certain arrangements and conditions in said deed defined. This deed to the State was given before plaintiff's predecessor, the railway company, had acquired any paper title either by the Dunning deed or contract. This fifteen acres appears to have been later accepted by the grantee as 11.873 acres when it accepted and recorded the deed from Webb which

was acknowledged on November 6, 1899. This conveyance did not include the premises in question. Thus, as matters then stood, the State had title to the following undivided interests in the said 7,000 acre tract: (a) through the Waldo partition, to an undivided one half of the 7,000 acre tract, subject to some small exceptions which are not material here, and subject also to an outlying title to an undivided one eighth thereof, originally granted to John Lawrence; (b) by its deed from Webb, to an undivided four twentieths of said tract and also to three fifths of the said Lawrence title to an undivided one eighth thereof which came to Webb by mesne conveyances from some of the heirs at law of the aforesaid John Lawrence, subject to the following exceptions: (1) as to the aforesaid undivided four twentieths, subject to an undivided two fifths of an undivided one eighth of the whole tract outstanding in the heirs of John Lawrence, and subject also to such of Mead's undivided interest as had been effectually conveyed by him to Durant as aforesaid; (2) other immaterial minor exceptions.

As afore-stated the evidence is that the adverse possession of Dunning was immediately and uninterruptedly continued by his grantee, the railway company, from and after May 25, 1899, and by it and its successors in title it has continued to date. While, for the reasons aforesaid, I believe this was ineffectual to ripen into good title as against the title and interests acquired by the State, it was effectual, in my opinion, as against all other individual owners of the titles to the remaining undivided interests. This being so, such possession ripened into a title at least at the end of its twenty-year continuance which must have been sometime in the year 1902, at which time the State had acquired no other valid titles then as afore-stated. The defendant has proven that in December, 1894, it made publication of "a list of wild, vacant, and forest lands" to which it held title from a tax sale or otherwise pursuant to the provisions of section 13 of chapter 711 of the Laws of 1893 (now Tax Law, § 133) and that the aforesaid 7,000 acre tract was included therein by appropriate description. Because of this the State argues that since the land in question was even but a small part of said 7,000 acre tract the statutory, fictional "actual possession" by the State was such as to preclude any kind of possession by anyone else, even the continuation of adverse possession by Dunning or that of the railway company which in fact immediately succeeded the latter. With this I cannot agree because when said notice was published the lands in question as possessed and occupied by Dunning cannot be said to have been wild, vacant forest lands within the purview and meaning of the statute. Having as they did an occupant upon them who had been dwelling and residing upon them as his sole and permanent place of abode continuously for ten years previous, such lands so occupied had lost their wild and vacant character as defined by the statute. (*People* v. *Durey,* 126 Misc. 642; *People* v. *Witherbee,* 199 App. Div. 272, 278.) Moreover, at the time of the publication of such notice the State held a valid title to only one half of an undivided seven eighths of the 7,000 acre tract. The publication of the notice could not legally dispossess the constructive possession of the owners of valid titles to the remainder, who then were the heirs of Abner Benedict, of John Lawrence and one Luela Marsh and perhaps Thomas C. Durant. Such owners continued as tenants in common with the State and equally in possession. As against these individual tenants in common I fail to see how an actual possession and occupancy of the lands could be brought to naught by the aforesaid publication or that it could be effectual to avoid its continuation as against the individual owners of other undivided interests.

There is another view which it seems permissible to take of the matter and which I believe gives the same result, although based upon different premise.

Up to 1903 the title to an undivided six twentieths of the 7,000 acre tract was outstanding in the heirs at law of Abner Benedict (subject to the outstanding title to an undivided one eighth in the heirs of John Lawrence or their assigns). In 1903 to 1908, both inclusive, by various conveyances, the said Abner Benedict title was conveyed, in various parts, to John N. Golding and Frank L. Bell, and, as we have seen in 1909 a suit in partition was brought and completed by the State against said Bell and Golding and the premises in question were included in the remainder of the said 7,000 acre tract which was set off to the State after certain specifically defined portions were partitioned to Bell and Golding, respectively. When all of the deeds to the aforesaid Abner Benedict ownership were given in 1903–08, the plaintiff's predecessor in title, the Raquette Lake Railway Company, was in actual possession of the premises in suit, claiming same adversely under a color of title, viz.: the Dunning deed. During those times, the statute provided that a grant of real property was absolutely void if at the time of the delivery thereof such property was in the actual possession of a person claiming under a title adverse to that of the grantor. (Real Property Law of 1896, § 225; L. 1896, ch. 547; now § 260.) I think it must be held that the railway company's possession at that time was an adverse possession under that rule of the statute. (*People* v. *Ladew*, 237 N. Y. 413, 430, 436, *supra*.) On the authority last cited, the statute's then exception of said rule as to grants made directly to the State does not apply when it "needs trace its title through him" who had received a grant rendered void under the statute. See *People* v. *Ladew* (*supra*, pp. 435–436) wherein it is stated as: "We cannot, therefore, believe that because Mr. Webb's grantors might have conveyed directly to the state and that had they done so the state might have maintained an action in ejectment in its own name, the same result follows when it needs trace its title through him. In the one case the conveyance is good, not void. Title passes and the right to enforce possession. In the second, nothing. The state may not acquire from Webb what he never had. If title passes, when? Clearly it is in Webb's grantors after the conveyance to Webb. It remains in them if Webb chooses to convey to an individual. Does it pass directly from them to the state when Webb delivers his deed? Or may the state question a conveyance from the same grantors to Ladew? Webb could not. We cannot assent to these propositions. And if we do not, when in 1910, the rule to the effect of such conveyance was amended by adding 'the provisions of this section do not apply to a grant of such property made to the People of the state of New York, nor to a person where the title granted to such person shall thereafter, by grant or mesne conveyance become vested in said People,' we think more was effected than a mere change of procedure. Were that all the statute might be construed as retrospective in operation. But it alters the substance of the law. It provides for a transfer of title. At present the statute states that such a series of transfers as that before us would vest title in the People. They may sue and recover in their own name. This being so, under well-settled principles of construction we must treat the act as prospective only. Our conclusion is, therefore, that the state never acquired record title to the islands in question."

Therefore, since the statute is not retrospective (see, also, *Partello* v. *People*, 14 N. Y. S. 2d 264), the recent 1941 amendment is immaterial here, and I feel that on the authority aforesaid it must be held that through the Bell-Golding partition the State derived no additional title to that part of the 7,000 acre tract

consisting of the premises in question. The deeds of the Abner Benedict title to Bell and Golding being void as to said premises in suit here, then as to them there was nothing which could be partitioned, and accordingly, even though the original adverse possession by Dunning be ignored, for whatever cause, it follows that the adverse possession of the plaintiff and its predecessors in title, since Dunning, has been sufficient to ripen it into a good title as against the outstanding Abner Benedict ownership. Such adverse possession having continued to date it seems that it must be held to have been effectual to long since, and certainly by 1920, have ripened into a title as against all interests save those acquired by the State from the Waldo partition and from Webb, as aforesaid, and this without the aid of any adverse possession begun and continued for seventeen years by Dunning.

Thus the views I entertain respecting the proofs of the parties lead to the conclusion that they are each seized of valid titles to certain undivided interests in the premises in suit. This is a result which was not the primary objective of either party. Since they are tenants in common plaintiff's possession may not herein be disturbed. Each party has in addition to other relief, asked for a declaratory judgment, and for omnibus relief. However, I feel I may and should only regard this cause as an action brought under the provisions of article 15 of the Real Property Law and I will only so regard it. As such the authority is given by sections 503, 504 and 507 of the Real Property Law, for the court to render judgment which will " enforce in any manner " and " establish " the " interest " of the defendant (§§ 503, 504) and, for the plaintiff, one which will forever bar the defendant " of any particular interest " (§ 507). I appreciate that should another partition suit ensue involving only the land in this action or it and other lands, between these parties, or with other parties added, the nature and extent of the ownership of the parties here can therein be determined. A judgment that the parties to this action are each seized of valid title to an undivided part or portion of the land, that they are tenants in common and equally entitled to possession, could perhaps here thus end. Later in partition the interests could be definitely admeasured and determined. I am willing, however, to go somewhat further and to decide and adjudge the extent of ownership under the titles established subject to the qualification hereinafter made, as to the subject matter of which I do not deem the proofs sufficiently clear for decision. To that end I therefore give it as my opinion that the defendant's proofs have established in it a valid title to the following fractional undivided interests of the lands in suit:

(a) from sovereign source and through the Waldo partition, 1/2 of an undivided 7/8...............70/160

(b) *id.,* deed from Webb, 4/20 of an undivided 7/8.....28/160

(c) *id.,* deed from Webb (Lawrence title), 3/5 of 1/8...12/160

Total.........................110/160

and that the plaintiff has established a valid title to the remainder of the undivided portion of said premises by adverse possession thereof by its predecessors in title, viz.: 50/160. The qualification as to the foregoing is as to the effect of the aforesaid conveyance from Mead to Durant, acknowledged April 13, 1880, and recorded in the Hamilton County Clerk's Office September 7, 1917, in book of deeds 52 at page 149, which is left undetermined, so that when and as it be determined, the determination and extent of the ownership of the parties hereto as above stated shall be adjusted accordingly. Whatever title or interest effectively vested in the grantee, Durant, by virtue of that conveyance, shall proportionately lessen the extent of the State's interest and enlarge that of the plaintiff as hereinabove last stated.

A decision in accord with the views above expressed may be settled on notice at which time the requests to find heretofore submitted may be resubmitted in the same or amended form or content as the parties may elect.

Dated March 6, 1943.

Judgment affirmed, with costs. Hill, P. J., Heffernan, Foster and Lawrence, JJ., concur; Brewster, J., taking no part.